STEPHEN G. PAPA ET AL. *v.* NEW HAVEN FEDERATION OF TEACHERS ET AL.

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and F. HENNESSY, Js.

Argued November 5, 1981—decision released April 27, 1982

*Karl Fleischmann,* with whom was *Joel M. Ellis,* for the appellants (defendants).

*Roger J. Frechette,* for the appellees (plaintiffs).

SPEZIALE, C. J.  This appeal concerns a teachers' strike in New Haven during November, 1975. The plaintiffs are the New Haven board of education and its members at the time of the strike. The defendants are the New Haven Federation of

Teachers, which is the certified bargaining representative for New Haven's teachers under General Statutes § 10-153b, and numerous specifically named teachers. The defendants were found in contempt for violating a temporary injunction prohibiting the continuance of the strike and have appealed. Before the defendants purged themselves of contempt and the strike was settled, approximately ninety teachers were incarcerated for various periods of time during the eleven days of the strike and fines totaling $224,500 were imposed.

## I

### BACKGROUND

Before we consider the defendants' numerous claims of error, a review of the trial court's actions concerning the strike will be helpful. On November 10, 1975, counsel for the plaintiff New Haven board of education applied to the Superior Court for an ex parte injunction under General Statutes § 10-153e[1] to enjoin the defendant New Haven Federation of Teachers (hereinafter the Federation) and the certified professional employees, i.e., the teachers, from participating in the strike which had begun earlier in the day. The temporary injunc-

---

[1] General Statutes § 10-153e, as then in effect, provided: "STRIKES PROHIBITED. No certified professional employee shall, in an effort to effect a settlement of any disagreement with his employing board of education, engage in any strike or concerted refusal to render services. This provision may be enforced in the superior court for any county in which said board of education is located by an ex parte temporary injunction issued by said court or a judge thereof; provided, if such injunction is issued, such employee may file a motion to dissolve such injunction and a hearing upon such motion shall be held by the superior court not later than three days after service of such motion upon said board of education pursuant to an order of court or a judge thereof."

tion was issued on November 10, 1975, by the trial court, *O'Sullivan, J.* Counsel for the defendants unsuccessfully attempted to obtain a hearing prior to the issuance of the ex parte injunction.

Two days later, on November 12, the plaintiffs moved for an order to show cause why the Federation and certain named teachers should not be held in contempt for violating the injunction. On that date two such orders were issued by the trial court, *Saden, J.*, with the first directed to the Federation and the twelve teachers who comprised its negotiating team and the second to a larger group of teachers. Also on November 12, the defendants moved to dissolve the temporary injunction. The hearing on the first show cause order and the defendants' motion to dissolve was held on November 13 before Judge Saden, and at that time the defendants moved for the recusal of Judge Saden, referring to a speech given by Judge Saden about a month earlier in which he was critical of various illegal activities, including strikes by teachers.[2] Judge Saden denied the motions and found the Federation and the twelve-member negotiating team to be in contempt.[3] The court imposed conditional and coercive penalties on the defendants found in contempt, which could be avoided entirely if the

---

[2] The defendants' "MOTION FOR RECUSAL," filed on November 13, 1975, was as follows: "The Defendants move that Judge George A. Saden recuse himself from consideration of the captioned action on the grounds that he had publicly stated views about teacher strikes which are incompatible with a disinterested decision upon the issues to be decided."

[3] The twelve members of the Federation's negotiating team who were found in contempt on November 13, 1975, are: Frank Carrano, Viola Gradeck, Charles Hare, Mary Johnson, Charles Keane, James Langan, Joseph Montagna, James Plude, Celia Small, Bernice Thompson, Catherine Tuttle, and Neil Wellens.

defendants returned to work by the next morning. In the event that the contempt continued, the twelve teachers on the negotiating team were to be incarcerated until they purged themselves of contempt and were to be fined $250 for each day they remained in contempt. The Federation was to be fined $5000 per day. The strike did not end by the next morning so the conditional penalties were imposed.

On November 18, 1975, a larger group of teachers appeared before the court on the second show cause order. At this time, another seventy-five teachers were found to be in contempt.[4] Again, the conditional and coercive penalties of incarceration and $250 per day fines were imposed.

---

[4] The seventy-five teachers who were found in contempt on November 18, 1975, are: Ernest Adinolfi, Anna Marie Alfieri, Anthony Annunziata, Joyce Atkins, Peter Barbarito, Laurel Billings, Robert Biral, Rosemarie Bliznick, Marc Blosveren, Lou Bohman, Joseph Borkowski, Henry Brajkovic, Andrew Bram, Virginia Brooks, Ralph Buccini, Jr., James Calderwood, Jr., Frank Caparulo, Robert Casey, Martin Churney, Jonathan Clark, Patricia Cucuzza, Gerald Cuddy, John Cummings, Carl DiGuiseppe, James Dinnan, Edwin Elwood, Frank Esposito, Peter Evans, Marguerite Flannery, Laila Fontella, Anne Fraulo, Doris Gamble, Anthony Giglio, John Golden, Carolyn Grabowski, Creola Gregg, Peter Herndon, Maureen Howard, James Johnson, Jr., Stephen Klimczak, Marilyn Krevit, Katherine Looney, William Mansfield, Richard Mazan, John McDonough, Rose Mentone, Frank Milano, Maria Moniello, Helen Moore, Frank Morgillo, Lawrence Morico, Horace Morone, Walter Nagorski, Shirley Neighbors, Patricia Niece, Ralph Pagnotti, Thomas Pascale, Donald Prue, Joan Rapczynski, Harry Reid, Joseph Richello, Blynn Roberts, Waldron Roberts, Richard Romano, Anthony Sansone, Sonya Saxe, Ruth Schwartz, Richard Serafino, Rhoda Spear, Lynne Spichiger, Michael Swiatek, Lula White, Gladys Whitney, Joyce Williams and Florence Zywocinski.

We note that three additional teachers, Linda Churney, Thomas Daley and Jeanne Hickey, appeared before the court on November 24, 1975, to purge themselves of contempt. It is unclear from the record whether these three teachers were incarcerated.

On November 24, 1975, after a breakthrough in negotiations, the strike was settled and the defendants appeared in court to purge themselves of contempt. At this hearing the defendants orally moved for remittance or rescission of the fines. The defendants also orally renewed their motion for recusal of Judge Saden, specifically referring to a reporter's interview with Judge Saden concerning the case which had appeared in a newspaper on November 23. The defendants also moved for a mistrial. These motions were denied by Judge Saden from the bench on the same day. The defendants timely filed their appeal.[5]

On appeal the defendants claim that the trial court's contempt judgments were erroneous for the following reasons: (1) the underlying injunction was invalid because the authorizing statute was unconstitutional and it did not authorize an injunction against the Federation; (2) the contempt penalties imposed were improper because simultaneous penalties were unauthorized or an abuse of discretion, and penalties were imposed for days on which the defendants could not purge themselves of contempt; and (3) the court erroneously denied the defendants' motions for recusal. The defendants have also challenged a number of the trial court's findings.

---

[5] The plaintiffs contend that defendants' appeal was not timely filed. This contention was resolved against the plaintiffs by this court's denial of the plaintiffs' motion to dismiss based on this ground. On December 8, 1975, the defendants filed a motion purporting to renew their motions for "recusal, remittance of fines and for mistrial." This motion was stricken from the record on April 8, 1976. The defendants filed their appeal on April 26, 1975. The appeal was filed within twenty days of the decision on a timely motion "which, if granted, would render the judgment or decision ineffective" and, therefore, was timely filed. Practice Book § 3007.

## II

### NATURE OF REVIEW

Because this is an appeal from a judgment of civil contempt, our review is technically limited to "questions of jurisdiction such as whether the court had authority to impose the punishment inflicted and whether the act or acts for which the penalty was imposed could constitute a contempt." *State* v. *Jackson,* 147 Conn. 167, 170, 158 A.2d 166 (1960); see *Leslie* v. *Leslie,* 174 Conn. 399, 402–403, 389 A.2d 747 (1978); *Potter* v. *Board of Selectmen,* 174 Conn. 195, 197, 384 A.2d 369 (1978); *Tobey* v. *Tobey,* 165 Conn. 742, 746, 345 A.2d 21 (1974); *Stoner* v. *Stoner,* 163 Conn. 345, 359, 307 A.2d 146 (1972); *Goodhart* v. *State,* 84 Conn. 60, 63, 78 A. 853 (1911). This limitation originates because by its very nature the court's contempt power, "to be effectual, must be immediate and peremptory, and not subject to suspension at the mere will of the offender." *Tyler* v. *Hamersley,* 44 Conn. 393, 412 (1877). It is for this reason that an appeal from a civil contempt judgment does not automatically stay its execution. Id.; cf. Practice Book § 3065. Indeed, the conditional and coercive nature of civil contempt would be rendered virtually meaningless were the trial court's power automatically stayed by an appeal.[6]

On the other hand, the trial court's need for immediate and effective contempt power must be balanced against the contemnor's fundamental

[6] The plaintiffs contend that the appeal should be dismissed as moot because the defendants have purged themselves of contempt and paid the fines imposed. But this view is incorrect. The contempt judgments in this case were intended to be coercive and therefore provided that the defendants could not purge themselves of contempt until the incurred fines had been paid. Because the appeal from a

rights and, for this reason, there exists the present mechanism for the eventual review of errors which allegedly infringe on these rights. See *Baldwin* v. *Miles,* 58 Conn. 496, 498, 20 A. 618 (1890). We have found a civil contempt to be improper or erroneous because: the injunction on which it was based was vague and indefinite; *Baldwin* v. *Miles,* supra, 502; the findings on which it was based were ambiguous and irreconcilable; *Leslie* v. *Leslie,* supra, 404; the contemnor's constitutional rights were not properly safeguarded; *Board of Education* v. *Shelton Education Assn.,* 173 Conn. 81, 87, 376 A.2d 1080 (1977); the penalties imposed were criminal rather than civil in nature; *McTigue* v. *New London Education Assn.,* 164 Conn. 348, 355–56, 321 A.2d 462 (1973); and the contemnor, through no fault of his own, was unable to obey the court's order. *Tobey* v. *Tobey,* supra, 746. Thus, although the scope of review on an appeal from a judgment of civil contempt is limited to some extent, it is sufficiently broad to encompass many claims of error which may not appear on their face to be jurisdictional in nature. See *Baldwin* v. *Miles,* supra.

## III

### VALIDITY OF INJUNCTION

The defendants' first claim of error is that the contempt judgment is based on an invalid injunction, because the statute authorizing this injunction is (A) unconstitutional and (B) not applicable to

judgment of civil contempt does not automatically stay the enforcement of the contempt penalties, the defendants can not be expected to continue in contempt throughout their appeal. The payment of the fines, therefore, does not waive the defendants' right to limited review of the propriety of the imposition of these fines. Although the defendants' incarceration, if erroneous, can not now be undone, the payment of the fines, if erroneous, can be.

the Federation. The issuance of a temporary injunction, of course, is not a final judgment and, thus, is not itself appealable. *Board of Education* v. *Shelton Education Assn.*, supra, 87–88; cf. General Statutes § 31-118 (providing for appeals from temporary injunctions in certain labor disputes). As a consequence, only those claims of error which concern the court's authority to issue the injunction and thereby its authority to find contempt for violations thereof may be reviewed in the present proceeding. Thus, certain claims by the defendants concerning the injunction are not reviewable because they concern the court's discretion, not its authority.[7]

## A

### CONSTITUTIONALITY OF GENERAL STATUTES § 10-153e

The defendants contend that the statute which authorized the injunction in this case, § 10-153e,[8] is unconstitutional because it violates the due process and equal protection guarantees. The defendants do not challenge the constitutionality of the statute's underlying prohibition of teachers' strikes, which has been upheld by this court. See *McTigue* v. *New London Education Assn.*, supra, 359; *Norwalk Teachers' Assn.* v. *Board of Education*, 138 Conn. 269, 276, 83 A.2d 482 (1951). Rather, the defendants challenge the statute's authorization of an automatic ex parte injunction, without any showing of the need for an injunction, without notice.

---

[7] Claims of error pursued by the defendants, but which are not reviewable in the present proceeding, include the claim that the court erred in refusing to hear evidence concerning the board of education's failure to negotiate in good faith as required by General Statutes § 10-153d and the claim that the court erred in refusing to try to resolve the underlying labor dispute.

[8] See footnote 1, supra.

Cf. General Statutes § 52-473 (providing for an ex parte injunction only upon a showing that irreparable harm will result before the matter can be heard on notice). According to the defendants, the automatic ex parte injunction violates their due process notice rights and, because such an injunction is available against only teachers and not other government employees, violates their equal protection rights as well.

It is important to note that § 10-153e was amended soon after the New Haven teachers' strike, and the provision authorizing an automatic ex parte injunction was deleted. Public Acts 1976, No. 76-403 § 5. In its place, the issuance of the authorized injunction was made subject to the procedure of §§ 52-471 through 52-479, which sections are the general provisions governing the issuance of injunctions. Thus, neither of the defendants' constitutional claims applies to the present version of § 10-153e.[9] As a consequence, it is necessary for us to consider only whether the rights of these specific defendants were violated by the actual procedure through which the temporary injunction was issued in this case.

[9] The legislative history of Public Acts 1976, No. 76-403 indicates that the modification of the injunction provision of General Statutes § 10-153e was based on the considerations raised by the defendants concerning the ex parte injunction. During Senate debate on House Bill 5117, which became Public Act 76-403, Senator Howard Owens stated: "For some reasons, school teachers have been singled out as the only people that are the subject matter of this discriminatory legislation, so far as the ex parte injunction is concerned. [This bill] repeals the harsh dictates of the ex parte injunction that apply to teachers only. This was wrong and this was bad legislation. We have now corrected this." 19 S. Proc., Pt. 6, 1976 Sess., p. 2560; see also 19 H.R. Proc., Pt. 8, 1976 Sess., p. 3206 (remarks of Rep. Howard Klebanoff); Hearings before Joint Standing Committee on Education, Pt. 3, 1976 Sess., pp. 677–87 (testimony of Ronald O'Brien).

The defendants' due process rights were not violated in this case. "The due process clause of the fourteenth amendment requires an opportunity for a hearing at a meaningful time and in a meaningful manner appropriate to the nature of the case. *Boddie* v. *Connecticut*, 401 U.S. 371, 378, 91 S. Ct. 780, 28 L. Ed. 2d 113 [1971]." *Schwartz* v. *Town Plan & Zoning Commission*, 168 Conn. 20, 24, 357 A.2d 495 (1975); see *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 572–73, 409 A.2d 1020 (1979); *Roundhouse Construction Corporation* v. *Telesco Masons Supplies Co.*, 168 Conn. 371, 376–77, 362 A.2d 778 (1975). The defendants were aware on November 10 that an injunction was to be issued against them, as indicated by their attempt to obtain a hearing prior to the issuance of the injunction. Although the defendants were not allowed to be heard before the injunction was issued, they were provided with a meaningful hearing on their motion to dissolve within three days, as provided by § 10-153e, and before the order to show cause was heard or penalties were imposed. In view of these facts, it cannot be said that the defendants' due process rights to notice and to be heard were violated.

Nor can it be said that the defendants' equal protection rights were violated in this case. The defendants' claim of an equal protection violation has been raised for the first time on appeal. Because the claim was not properly presented to the trial court, it is not properly preserved for review in this proceeding.[10] Practice Book § 3063.

[10] This is not to suggest that we would reach a different result were we to reach the merits of this claim. "Where legislation neither containing a suspect classification nor impinging upon a fundamental right is challenged on equal protection grounds, the burden is on the

## B

### APPLICABILITY OF GENERAL STATUTES § 10-153e TO THE FEDERATION

The defendants claim that the injunction was invalid as to the Federation because § 10-153e authorizes an injunction only against individual teachers, and, therefore, the contempt judgment against the Federation was unauthorized. The defendants' claim, however, is based on a narrow and unrealistic reading of the statute.

Section 10-153e does not limit the reach of the injunction only to individual teachers. As a practical matter, the teachers' association usually plays an integral role in a teachers' strike. If the actions of the association itself were insulated from the court's authority to enjoin a strike, the effectiveness of the court's enforcement of its orders could well be undermined. The legislature intended that the injunction provision apply to teachers' associations as well as to individual teachers. Related statutory provisions, enacted after the strike in this case, provide for service of process for actions under § 10-153e, with the exception of citations for con-

complaining party to establish that the statutory distinction is without rational basis. *Horton* v. *Meskill,* [172 Conn. 615, 640, 376 A.2d 359 (1977)]; *Kellems* v. *Brown,* 163 Conn. 478, 486, 313 A.2d 53 [1972], appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 [1973]." *Miller* v. *Heffernan,* 173 Conn. 506, 509, 378 A.2d 572 (1977). A showing of a mere facial difference in the treatment of teacher labor relations and the treatment of labor relations concerning other governmental employees does not establish an equal protection violation. Even if the defendants had shown a substantive difference, they have not shown that the legislature could not rationally treat labor relations concerning teachers differently from labor relations concerning other groups of governmental employees. Thus, we could not say in this case that the defendants were denied their right to equal protection.

tempt, on the statutory agent designated by the teachers' association. General Statutes §§10-153i, 10-153j. As an unincorporated association, a teachers' association may be sued directly. General Statutes § 52-76. We conclude that the injunction authorized by § 10-153e may be issued against the Federation.

## IV

### CIVIL CONTEMPT PENALTIES

The defendants also claim that the court erred in the civil contempt penalties which were imposed. In particular, the defendants contend that the court erred in imposing (A) the simultaneous penalties of fine and incarceration, and (B) penalties for days on which the defendants could not purge themselves of contempt.

### A

#### SIMULTANEOUS PENALTIES OF INCARCERATION AND FINE

The defendants contend that the court lacked the authority to impose, and abused its discretion by imposing, simultaneous coercive penalties of incarceration and fine. These claims are reviewable in an appeal from the contempt judgment, because the contemnor must have some remedy for unauthorized or excessive penalties.

The court's authority to impose civil contempt penalties arises not from statutory provisions but from the common law. *Potter* v. *Board of Selectmen,* supra, 197; *Welch* v. *Barber,* 52 Conn. 147, 156 (1884); *Huntington* v. *McMahon,* 48 Conn. 174, 196 (1880). The penalties which may be imposed, therefore, arise from the inherent power of the court to coerce compliance with its orders. In Connecticut, the court has the authority in civil contempt to

impose on the contemnor either incarceration or a fine or both. *Rogers Manufacturing Co.* v. *Rogers,* 38 Conn. 121, 123–24 (1871); see *Board of Education* v. *Shelton Education Assn.,* supra.

The evaluation of civil contempt penalties depends to a great extent on whether the penalties are considered at the time they are first conditionally imposed for the purpose of coercing compliance or are considered after the contempt has been purged and the penalties are finalized. When the penalties are first imposed, the propriety of the court's exercise of its discretion turns on the reasonableness of the amount of the coercion that the court deems necessary, keeping in mind the court's ultimate power to reduce the penalties once the contempt has been purged. We cannot say in this case that the fact that the court simultaneously imposed two forms of conditional penalty to coerce compliance amounted to an abuse of discretion. It may be a better practice, as the defendants suggest, for the court to impose civil contempt penalties in increasingly harsh stages so as to increase the pressure on the contemnor. See *Matter of Grand Jury Impaneled Jan. 21, 1975,* 529 F.2d 543, 551 (3d Cir. 1976). Although our opinion might differ from that of the trial court we cannot say that the initial conditional penalties imposed by the court in this case were so harsh that they amounted to an abuse of discretion.

## B

### INABILITY TO PURGE

The defendants contend that the court erred in imposing penalties for days on which the defendants were unable to purge themselves of contempt. This claim is reviewable because such penalties

would not be proper in a civil contempt proceeding. *Board of Education* v. *Shelton Education Assn.,* supra, 87.

The defendants maintain that they could not purge themselves of contempt on days on which the schools were officially closed. This assertion is incorrect, however, because the court considered an individual defendant purged of contempt upon a sworn statement that he or she was terminating participation in the strike and would return to school when it was next open. Thus, the fact that schools were closed on a particular day did not prevent the defendants from purging themselves of contempt.

It is true that the court on November 17 restricted the defendants' opportunity to purge themselves of contempt to periods of time in which the court was in regular session and that as a consequence of this the defendants could not purge themselves of contempt during the weekend of November 22–23. Although as a general matter such a restriction might be inappropriate, it was justified under the facts of this case.

The restriction expressly arose because during the previous weekend the court had made itself available during the late evening of Friday, November 14, 1975, and the early morning hours of Saturday, November 15, at which time the incarcerated members of the negotiating team were released upon signing a statement that they would return to work on Monday, November 17.[11] The members of

[11] The statement signed by the twelve members of the negotiating team reads as follows: "I will recommend and vote for immediate termination of the strike and return to full time normal duties on Monday, November 17, at 7:45 A.M., and I will myself return to my full time normal duties at that time."

the negotiating team, after failing to reach an agreement with the board of education, reneged on their written promise and refused to return to work on Monday. The court on November 17, considering these defendants to have acted in bad faith, recommitted them under the original contempt order and imposed the requirement that in the future any purging would be in open court and under oath. The defendants were fully aware that this meant that if they did not purge themselves by Friday afternoon, they would not be able to purge themselves until the next Monday, because the court expressly told them so. Under these facts the restriction was reasonable and justified. It was ultimately the defendants' actions which required them to remain in contempt until Monday, November 24.

## V

### Motions For Recusal

The defendants contend that the court erred in denying their motions for recusal. Such a claim of error is reviewable in this proceeding because it goes to the defendants' fundamental right to a fair trial. *Baldwin* v. *Miles,* 58 Conn. 496, 498, 20 A. 618 (1890). For purposes of this appeal, there are two motions for recusal which must be considered. The first was made on November 13, 1975, at the initial hearing on the defendants' motion to dissolve and the first show cause order, and concerned a speech given by Judge Saden on October 7, 1975, in which he discussed teachers' strikes. The second motion was made on November 24, 1975, the day on which the defendants purged themselves of contempt, and

concerned an interview with Judge Saden which had appeared in a newspaper the previous day.[12]

On October 7, 1975, as part of his official duties, Judge Saden gave a speech to a group of newly admitted lawyers. In the course of this speech, the general theme of which was the obligation to obey the law, Judge Saden criticized illegal teachers' strikes[13] and, according to the defendants, com-

---

[12] Because of our resolution of the defendants' claim regarding these two motions for recusal, it is not necessary for us to consider the defendants' third motion for recusal, which was made on December 8, and referred to an "interview" with Judge Saden which appeared on a local television broadcast.

[13] In relevant part, Judge Saden's October 7 speech; "Remarks to New Lawyers (and Old)," 50 Conn. B.J. 1, 8–10 (1976); included the following: "In 1953 James B. Conant, then president of Harvard, described the purpose of education as the cultivation in our future citizens of an appreciation of both the responsibilites and the benefits which come to them because they are Americans and are free. If this is the objective of education, I think it has in substantial degree failed dismally. Perhaps the most startling example of this failure is found in the teachers' strikes that have occurred in New York City and right here in Connecticut, not to mention many cities beyond our borders. But Albert E. Wiggam in 1923 said something about education that may well be in point. He remarked: 'Intelligence appears to be the thing that enables a man to get along without education. Education appears to be the thing that enables a man to get along without use of his intelligence.'

"When we gauge the conduct of teachers' unions striking in defiance of the law, in the face of judicial injunction, and parading in picket lines where the world and their own students can observe them defying the law, then it becomes clear that they do not understand what Conant said and have made themselves classic examples of what Wiggam said, that is, they are acting without intelligence.

"By so doing, these supposedly 'educated' individuals have destroyed the basis for the respect of the children they teach, their parents, the community, and the nation. Adding to all this the fact that these present strikes are doubly absurd, given the severe economic stress confronting the country, one wonders whether these teachers have, by their examples, anything to teach their children except the wrong things. The conduct of all of us to some degree reflects the kind of teaching and discipline we have had in our earlier years. The tide of irresponsibility that is presently at flood stage and going higher all the time has not been substantially stemmed

mitted himself to a public position incompatible with his obligation to provide a disinterested and impartial forum for the resolution of the issues presented by this case.

because of the inadequacies of the teaching profession itself. They have failed to erect the disciplinary barriers to restrain such inundation that should have been created in the early years of youths of all ages. Rights and responsibilites go hand in hand, and if teachers themselves have not learned this simple truth, they certainly can never teach them.

"It would not be difficult to tick off innumerable other instances of similar actions that permeate our society today. This is the milieu in which you must function as lawyers. No doubt it would be easy for most of you to slide into the same intellectual and moral morass that surrounds you. But you do have a choice—a choice not to succumb to the suction of that quagmire. You owe it to yourselves as decent men and women—(or perhaps I should say 'persons')—to lift your feet out of it onto firmer ground, to remember that you take on a responsibility when you become a lawyer, and not merely a right to be one, that you constantly retain in your minds that tandem phrase so vital in our lives in a free society—rights and responsibilities.

"George Bernard Shaw in 1931 made a radio address from London to America in which he said: 'Every person who owes his life to civilized society and who has enjoyed since his childhood its very costly protections and advantages should appear at reasonable intervals before a properly qualified jury to justify his existence, which should be summarily and painlessly terminated if he fails to justify it and it develops that he is a positive nuisance and more trouble than he is worth. Nothing less will really make people responsible citizens.'

"Shaw was not being entirely facetious when he made that observation. But in a much more serious vein, on one occasion, Walter Lippmann, commenting upon the ease with which people had accepted their freedom, said: 'They forgot that their rights were founded on their duties and they thought that to get while the getting was good, whether by private smartness or by collective pressure, was a normal and natural thing to do. . . . There is no use looking into the blank future for some new and fancy revelation of what man needs in order to live.'

"In other words, we finally must revert again to the fundamental proposition that the concept of joint rights and responsibilities is not old-fashioned, nor is it replaceable by any new, magic formula. Either this interlocking concept is accepted as a whole and as the immovable cornerstone of a free society or its disintegration into nothing but rights will herald the end of democracy as we know it."

It is important to note the limitation on the defendants' claim concerning the speech. The defendants do not claim that Judge Saden's comments regarding teachers' strikes were generated by or made in reference to an impending teachers' strike in New Haven during the fall of 1975. If there were any evidence that Judge Saden's comments were directed at an impending strike then there could be a serious claim that the judge had prejudged the case. The defendants have not made this claim. Rather, they have taken the much more limited position that Judge Saden's general comments on the propriety of illegal teachers' strikes are sufficient to require his disqualification.

"A [judge] is bound by his oath not to be 'of counsel in any quarrel that shall come before him'; and he ought also to be cautious in declaring extra-judicial opinions, lest an undue use should be made of them; yet he is not, merely by having manifested his opinion on a question of law, legally disqualified from judging in a cause in which that question comes up . . . ." *Wilson* v. *Hinkley*, Kirby 199, 201 (Conn. 1787). So long as a judge's public comments critical of those who disobey the law do not raise a reasonable question whether the judge has prejudged a pending or impending case, it would be difficult for such comments to require the judge's disqualification. In the course of their duties, judges frequently express opinions about specific laws, the obligation to obey and the consequences of disobedience. Given that such judicial expressions of opinion do not disqualify judges from sitting on later cases involving the same legal issues, it is

difficult to perceive why judges' general, extra-judicial comments concerning legal issues disqualify them from hearing later cases involving those issues.

The defendants are correct, however, when they question the standard by which the court evaluated their first motion for recusal. The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. In Connecticut, the disqualification of judges is governed by General Statutes § 51-39[14] and Canon 3 (C) of the Code of Judicial Conduct.[15] Under Canon 3 (C) (1) of the

[14] [General Statutes] Sec. 51-39. DISQUALIFICATION BY RELATIONSHIP OR INTEREST. JUDGE MAY ACT WITH CONSENT OF PARTIES. When there is so near a relationship between any judge and any party in any proceeding in court before him, as between father and son, brothers or uncle and nephew, by nature or marriage, or landlord and tenant; or when any judge may be liable to contribute to the damages, costs or expenses of any such proceeding, or when he may receive a direct pecuniary benefit by the determination thereof, he shall be disqualified to act, except as herein provided. No judge shall be disqualified to act in any proceeding by reason of his being a member of any ecclesiastical corporation, unless it is a party to the action, nor in any proceeding in which any town, city or borough is a party or interested, by reason of his being an inhabitant thereof or liable to taxation therein or by reason of his being related to any taxpayer or inhabitant thereof. When any judge is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court."

[15] Canon 3 (C) of the Code of Judicial Conduct provides:

"C. Disqualification.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it; . . .

Code of Judicial Conduct "[a] judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might *reasonably* be questioned . . . ." (Emphasis added.) "Any conduct that would lead a reasonable [person] knowing all

(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding; . . .

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding;

(2) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(3) For the purposes of this section:

(a) the degree of relationship is calculated according to the civil law system; . . .

(b) 'fiduciary' includes such relationships as executor, administrator, trustee, and guardian;

(c) 'financial interest' means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(i) ownership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund;

(ii) an office in an educational, religious, charitable, fraternal, or civic organization is not a 'financial interest' in securities held by the organization;

(iii) the proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a 'financial interest' in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) ownership of government securities is a 'financial interest' in the issuer only if the outcome of the proceeding could substantially affect the value of the securities."

the circumstances to the conclusion that the judge's 'impartiality might reasonably be questioned' is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . ." Thode, Reporter's Notes to Code of Judicial Conduct (1973), pp. 60–61. "The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all of the circumstances." *Rice* v. *McKenzie,* 581 F.2d 1114, 1116 (4th Cir. 1978); see *Spires* v. *Hearst Corporation,* 420 F. Sup. 304, 307 (D. Cal. 1976).

Applying the objective standard to the defendants' claim concerning Judge Saden's speech, we conclude that the speech by itself did not provide a reasonable ground for questioning the judge's impartiality and, therefore, the denial of the defendants' first recusal motion was not erroneous.[16]

The defendants' second motion for recusal, made orally during the proceedings on November 24, 1975, concerns a separate ground for recusal which is basically unrelated to the first motion. On November 23, parts of a reporter's interview with Judge

---

[16] The defendants have urged us to adopt as a general rule the procedure employed in a number of jurisdictions under which a nonfrivolous motion for recusal is heard and decided by a judge other than the judge being challenged. The defendants contend alternatively that such a rule is required by the due process clause or that we should adopt the rule as a matter of judicial administration. Although there is merit in the rule proposed by the defendants, it is not required by due process and this appeal is not the appropriate forum for consideration of the adoption of such a rule for the Superior Court.

Saden appeared in a newspaper.[17] The substance of the interview, as reflected in the article and in the judge's own description of the interview, is a clear violation of the Code of Judicial Conduct. Canon 3 (A) (6) expressly provides that "[a] judge should abstain from public comment about a pending or impending proceeding in any court...."

It does not necessarily follow that if a judge makes any public comments whatsoever about a pending case that he must be disqualified. The act of giving an interview is not per se a basis for recusal. But in this case, Judge Saden's treatment of the defendants' motion for recusal based upon the interview clearly indicates that Judge Saden, under the

---

[17] The following article, with an accompanying photograph of Judge Saden, appeared in the Hartford Courant on November 23, 1975, pp. 1, 18:

### "SADEN ALMOST CHOSE TEACHING

By J. Herbert Smith

NEW HAVEN—The judge who has jailed 90 New Haven teachers and is ready to jail more once planned to be a teacher but chose law because it paid more.

Superior Court Judge George A. Saden jailed the teachers last week after they defied his back-to-work order and stayed on strike for higher pay and smaller classes.

After turning down a graduate fellowship in English, the 1931 summa cum laude graduate of Yale headed for Harvard Law School and soon told the assistant dean there were too many students in some of the classes.

'Smaller classes are better for pupils,' Saden said Friday, but the New Haven teachers 'aren't fooling anybody. The vast majority of the people recognize' they are striking for more money.

In a wide-ranging, relaxed interview in his fourth floor Superior Court office, the former Republican politician and criminal lawyer said he agreed with the 1965 law that made teacher strikes illegal.

But even if they weren't against the law—'for cripes sake, of all people, teachers shouldn't strike. They are inviting further disciplinary problems in the schools,' he said.

'Many judges think we should be paid more, but if we went on strike it would be irresponsible. Teaching is supposed to be a pro-

standard described above, was disqualified from sitting on further proceedings in this case as of November 24, 1975. Whether the judge is disqualified by his or her public comments depends on the content of the comments. In this case there is a dispute about the content of Judge Saden's extra-judicial comments. The article describing the interview states that Judge Saden was "ready to jail more" teachers if the strike was not settled by Monday. Judge Saden is quoted as saying that the teachers " 'aren't fooling anybody. The vast majority of the people recognize' they are striking for more money." The article indicated that Judge Saden agreed with the law prohibiting teachers' strikes and that he said " 'it would be a goddam big

---

fession and teachers should start returning to being professionals again,' Saden said.

Educated in Bridgeport schools, the former Air Force major was appointed to the Superior Court bench in 1971. Many defense lawyers, he said with pride in his voice, would prefer to go before other judges. Saden is not known for leniency.

'On violent crimes a judge has got to be hard-nosed,' he said. 'Too damn many judges are tapping criminals on the wrist and saying "Now don't do it again." '

'Jail serves a purpose in terms of punishment,' he said. 'A guy has got to know he can't get away with something.'

In the case of the 90 teachers, 'We are not talking about a criminal mind,' the judge admitted, but he displayed no patience for those who say 'to hell with what the law is and decide to legislate for themselves.'

That is a 'step toward anarchy' where 'organized government ceases to exist,' said the man who 10 years ago served as general counsel for the state's constitutional convention when the basis for Connecticut law was redrawn.

A man with a varied career, Saden still—nearly a half century after deciding on law—wonders if teaching Tennyson and Browning might not have been his real calling. He is concerned about 'dedication' in the teaching field and remembers fondly those scholars who could share their knowledge with students. Some men with great minds just can't teach, he said.

'There was a time when I thought teachers were grossly underpaid. And I think they should be well paid, but they've got to realize

mistake' " to change the law. Judge Saden is also quoted as saying that even if it were not against the law " 'of all people, teachers shouldn't strike. They are inviting further disciplinary problems in the schools.' " Asked about the prospect of the strike growing bigger, Judge Saden is reported to have said " 'I better not comment. I've probably told you

the limitations of the taxpayer,' he said. As chairman of the Senate Labor Committee a generation ago, Saden said he was a strong advocate for workers' rights.

A bachelor and son of a package store owner, Saden thrives on his work. He is usually in his office until after 6 p.m. each day.

After service in World War II, then active duty in the reserves, Saden returned to Bridgeport and reopened his law practice. In 1953, he won a term in the State Senate.

**Drafted Plan**

Almost 20 years later he was to serve on a panel to redraw state legislative districts, a grueling task that finally was accomplished as 'the Saden plan' in accordance with 'what I called the political fairness doctrine,' he said.

Heavy set with a deep voice, thinning black hair and bushy black eyebrows, Saden talks with ease. He conjures up laughter and lets it roll out from deep inside.

'I got a real laugh out of this one,' he said, taking a letter from a pile of them in his drawer. A child's scribble read, 'I think you ought to let the teachers out . . . and Aunt Mary too . . . Love, Megan.'

It was the only one of several letters, phone calls, and even a telegram from Florida, critical of the judge's action. 'The silent majority is not with the teachers,' Saden said.

He was somber when presented with the possibility of changing the law and making teacher strikes legal. 'Weak-kneed politicians [b]etter not cave in. It would be a goddam big mistake' to change the law, he declared.

What about the prospect of an ever-widening strike with other unions joining the teachers? 'I better not comment. I've probably told you too much already,' he said. He emphasized he was expressing his own opinions, separate from his actions in the courtroom.

He said whether or not he agreed with the law, he would still uphold it. The law says the teachers can't strike, and if Monday arrives with no settlement, a second group of teachers will be processed through his court and sent to jail, he said."

too much already.' " According to the article, Judge Saden then "emphasized he was expressing his own opinions, separate from his actions in the court-room."[18]

Confronted with this article as a basis for disqualification, Judge Saden denied the motion from the bench stating that he had been misquoted and that there was nothing in the article which influenced the court's judgment in any way.[19] Unfortunately, even though the judge disputed the content of some of his comments as reported, no evidence was introduced concerning the nature of the interview which took place or any alleged misquotations in the newspaper article, though the presentation of such evidence was requested by counsel for the defendants. Yet, in the court's findings, there are more than four pages of factual findings concerning

[18] This is similar to a statement made by Judge Saden from the bench on November 24, after the defendants had purged themselves, where, after commending those teachers who did not strike, the Judge said: "There is a great deal that can be said on this subject. I intend to file a delayed memorandum, probably by the middle of next week, in which I will, in part, express my opinion as a private citizen, a little different from the usual type of memorandum filed by a Court in the average case, but this case is not average in any real sense of the word, and it is important, in my judgment, for the public to understand the real issue because I think it has been clouded and misunderstood in many quarters."

[19] Judge Saden stated from the bench in relevant part: "Now, as far as the motion for recusation [sic] is concerned, I will have to deny that motion. There is nothing that I need add that I haven't already said on the matter. There is nothing that I have stated to any newspaper who correctly quoted me, in several instances, and in several instances they have not correctly quoted me, from what I am told. . . . But there is nothing in there that is influencing my judgment in this case one whit, any more than there was in the statement that I made to the newly admitted lawyers . . . so that I can see no reason for reducing the amounts that are owed at this point or remitting any part of the penalties that have been imposed."

the nature of and limitations on the interview and the various errors and misquotations which appeared in the article.[20]

Such findings, which are not based on any evidence, are obviously improper. "In effect the trial

[20] The court's finding regarding the newspaper interview was in relevant part as follows: "The article in the Hartford paper . . . resulted from an interview in chambers requested by the Hartford reporter who was previously unknown to the trial judge. He indicated his desire to write a 'personal background' story of the trial judge, who acquiesced upon the understanding that the published story be limited to scope to exactly that, although quotations about the teachers' case could be used but only if they were taken from what had already occurred in open court. The interview lasted approximately two hours and was mainly concerned with the trial judge's personal background and history. No authorization was given to print publicly anything except personal background and quotations from the actual court proceedings which were already a matter of public record.

"These limitations by the trial judge, designed to prohibit any public comment about the case except from the record itself, were not observed in the printed article. Furthermore, the very poor quality of the article is illustrated by its many inaccuracies and 'ad libbing' insertions made by the reporter. Thus, for example, the reference to teaching Tennyson and Browning was erroneous. The trial judge merely mentioned 19t[h] century poetry and the former dean of Yale College William Clyde DeVane, who had been the judge's honors tutor in junior year and was a scholar in that field with special expertise in Browning. Also, the letter from the kindergarten school girl, Megan, was *not* one of the many *critical* letters received. The trial judge stated the *exact opposite*, viz., it was one of very few critical letters, but it was amusing because of its contents about her Aunt Mary. While the trial judge expressed disapproval of any change in the law, it was *not* expressed in the language reported. As for an 'ever-widening strike' with other unions joining, the trial judge merely said he had no comment and 'besides I have talked too long now,' referring then to the length of the interview which had already consumed a considerable amount of time. He did *not* use the language reported. The indirect sentence about 'expressing his own opinions, separate from his actions in the courtroom,' is purely the reporter's own phraseology, *not* the trial judge's. Furthermore, it does not express accurately what the judge said. The printed language probably derived in the reporter's mind from the judge's cautioning him that comments on the case must be taken only from the transcript of the court pro-

court, as a basis for these findings, made of himself a witness, and in making them availed himself of his personal knowledge; he became an unsworn witness to material facts without the defendant having any opportunity to cross-examine, to offer countervailing evidence or to know upon what evidence the decision would be made." *Kovacs* v.

ceedings, an excerpt of which with the judge's language used two days previously in open court was exhibited to the reporter for his use if he wanted it. He had been told any comment about the case itself must come from the court proceedings which had been completed two days previously and not from anything said in the informal chamber interview. One of the most egregious errors in the reported article is the indirect statement that a 'second group' of teachers would be processed and sent to jail on Monday. At the time of the interview on late Friday afternoon, no show cause order had been issued for any additional group of defendants (which would have been a *third,* not second, group) to appear for hearing on the following Monday, or any other day, nor to the judge's knowledge, was any such order contemplated by the plaintiffs. Certainly none had been, nor was, presented to the judge at any time, and no hearing of any kind was scheduled (as of late Friday afternoon) for Monday or any other day. In addition, there was no *occasion for the judge to predict,* nor did he predict, further action in the case itself, as the reporter erroneously stated. The latter was simply 'ad libbing,' just as he clearly was in his opening story line when he said the judge was 'ready to jail more.' For all such reporting, the judge *cannot be held responsible.*

"Another error in the story ascribed the back-to-work order as originally having been issued by the trial judge when, in fact, it had been issued by Judge O'Sullivan. The sentences partially in quotation that the teachers 'aren't fooling anybody. The vast majority of people recognize this' is correct except that the judge did *not* refer specifically to their striking for more money, or any other specific thing, as reported. (The Union's president, Carrano, did, however, admit on the witness stand that one of the reasons for the strike was the teachers' desire for more money.) Also, while the judge did say, as he had said in court, that teachers should not strike, he did *not* use the specific language purportedly quoted by the reporter, nor was the phrase 'cripes sake' used by the judge.

"Thus, it is clear that the entire article is loaded with inaccuracies which are the responsibility of the reporter only. The article is of poor quality, and to the extent it sought to go beyond the transcripts of the court proceedings, it did so without authority from the judge and was purely a personal excursion of the reporter."

*Szentes,* 130 Conn. 229, 233, 33 A.2d 124 (1943). But the more significant thing is that such findings indicate that Judge Saden became so personally involved that he felt the need to defend himself from allegations based on the article by trying to repudiate the substance of the article. By thus, in effect, becoming an unsworn witness, without allowing the defendants any opportunity to cross-examine or to offer countervailing evidence, Judge Saden clearly demonstrated such a personal interest in the case that his impartiality could reasonably be questioned.

It does not matter for purposes of this decision whether the newspaper's version of the interview is substantially correct or whether Judge Saden's numerous criticisms of the article are right. Applying the objective standard, we conclude that the article and Judge Saden's response to it clearly raise a reasonable question about Judge Saden's ability to remain fair and impartial through the remainder of the proceedings. It was error for the court to deny the defendants' November 24 motion for recusal based on the newspaper interview with Judge Saden. As a consequence, it was also error for the court to go on to decide the defendants' November 24 motion for remittance or rescision of the fines. That motion, therefore, will have to be considered on remand to the trial court.[21] All of the actions by Judge Saden in this case from November 24, 1975, and thereafter, including his

[21] Because of our resolution of the defendants' claims of error in this appeal, it is not necessary for the trial court on remand to consider the defendants' November 24, 1975, oral motion for mistrial.

finding filed on August 5, 1977, are null and void and are ordered stricken for the purposes of the remand.[22]

There is error in part, the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other judges concurred.

---

[22] In view of this conclusion, we do not need to address the defendants' numerous challenges to the findings of the trial court.