[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON THE PLAINTIFFS' APPEALFROM THE BETHEL PROBATE COURT
This matter is before the court on an appeal from the Bethel Probate Court, O'Grady, J., pursuant to General Statutes § 45a-186, brought by Marcelle M. Hall, individually and as executrix of the estate of Julian Altman, against Sherry Schoenwetter and the Estate of Sylvia Altman, beneficiaries under Julian Altman's will, arising out of the Probate Court's rejection of an interim accounting, prepared by Hall,[1] which failed to include a $263,475.75 "finder's fee" received by Hall for returning the Gibson Stradivarius violin to its rightful owner, Lloyd's of London.
I. JURISDICTION
CT Page 11491
Prior to deciding the merits of the appeal, the court must address the threshold issues of Hall's aggrievement and the timeliness of her appeal.
A. Aggrievement
General Statutes § 45a-186 provides that "[a]ny person aggrieved by any order, denial or decree of a court of probate in any matter" can appeal to the Superior Court. An appellant is aggrieved if she has a direct pecuniary interest in the appeal. Kucej v. Kucej, 34 Conn. App. 579, 582 n. 3,642 A.2d 81 (1994).
In the present case, since the Probate Court ordered Hall to return the "finder's fee" to the estate, she had a direct pecuniary interest in the appeal. Therefore, she is aggrieved and has standing to prosecute the appeal.
B. Timeliness of the appeal
Pursuant to General Statutes § 45a-187(a), an appeal under § 45a-186 must be taken within thirty days from the Probate Court's rendition of the order or decree appealed from. The appropriate method by which to commence an appeal is to file a motion for appeal with the Probate Court within the thirty day period. Fuller v. Marvin, 107 Conn. 354, 357,140 A. 731 (1928), citing Orcutt's Appeal from Probate,61 Conn. 378, 382, 24 A. 276 (1891).
In this case the Probate Court filed its order on October 11, 1991. Thereafter, Hall filed her motion for appeal which the Probate Court granted on October 25, 1991. Therefore, her appeal is timely.
II. STANDARD OF REVIEW
"An appeal from a Probate Court to the Superior Court is not an ordinary civil action. State v. Woodin, 90 Conn. 48,50-51, 96 A. 178 (1915); Silverstein's Appeal from Probate,13 Conn. App. 45, 52-53, 534 A.2d 1223 (1987). When entertaining an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate. Satti v. Rago, 186 Conn. 360, 365, 441 A.2d 615
(1982); Stevens' Appeal, 157 Conn. 576, 581, 255 A.2d 632
(1969); Dunham v. Dunham, 97 Conn. 440, 443, 117 A. 504
CT Page 11492 (1922); Slattery v. Woodin, [90 Conn. 48, 51, 96 A. 178
(1915)]; Wilson v. Warner, 84 Conn. 560, 564, 80 A. 718
(1911); Hewitt's Appeal from Probate, 53 Conn. 24, 35,1 A. 815 (1885); Davis's Appeal from Probate, 39 Conn. 395, 400
(1872). In ruling on a probate appeal, the Superior Court exercises the powers, not of a constitutional court of general or common law jurisdiction, but of a Probate Court. Slatteryv. Woodin, supra; Tolles's Appeal from Commissioners, 54 Conn. 521,524, 9 A. 403 (1886); Silverstein's Appeal from Probate,
supra, 13 Conn. App. 53.
The function of the Superior Court in appeals from a Probate Court is to take jurisdiction of the order or decree appealed from and to try that issue de novo. Baskin's Appealfrom Probate, 194 Conn. 635, 641, 484 A.2d 934 (1984); Sattiv. Rago, supra, 364-65; Stevens' Appeal, supra, 580-81;Hotchkiss' Appeal, 89 Conn. 420, 432, 95 A. 26 (1915);Silverstein's Appeal from Probate, supra, 13 Conn. App. 54. Thereafter, upon `consideration of all evidence presented on the appeal which would have been admissible in the probate court, the superior court should exercise the same power of judgment which the probate court possessed and decide the appeal as an original proposition unfettered by, and ignoring, the result reached in the probate court.' Prince v.Sheffield, 158 Conn. 286, 298, 259 A.2d 621 (1969)." Kerin v.Stangle, 209 Conn. 260, 263-65, 550 A.2d 1069 (1988).
"It is firmly established that in probate appeals, a Superior Court may admit any evidence that was received by the Probate Court or could have been received by it. Kerin v.Stangle, supra, 209 Conn. 265; Baskin's Appeal from Probate,
supra, 194 Conn. 641. The converse of this rule is that the Superior Court may not receive evidence that the Probate Court could not have received because it came into existence subsequent to the Probate Court hearing. Satti v. Rago,
supra, 186 Conn. 369." Bishop v. Bordonaro, 20 Conn. App. 58,64, 563 A.2d 1049 (1989).
"The judgment on appeal should affirm or reverse the decree appealed from, in whole or in part, and answer the questions raised by the reasons of appeal. The judicial role for probate appeals was succinctly stated two centuries ago inCase v. Case, Kirby 284, 285 (1787): `It is the province of the Superior Court, on appeals made from decrees of probate, to fix the principles of law, for the direction of the Courts CT Page 11493 of Probate; but it seems not to be authorized to proceed through all the forms to a complete settlement of estates, as a prerogative court. The execution of the law, as ascertained by the Superior Court, appertains to the courts of probate.' The proper judgment in an appeal from an order of decree should be returned to the Probate Court for further determination and termination of the proceedings in that court. The estate must always be settled in the Probate Court even when its administration is sidetracked or diverted temporarily by an appeal to the Superior Court."Silverstein's Appeal from Probate, supra, 13 Conn. App. 53-54.
"The Superior Court may not consider or adjudicate issues beyond the scope of those proper for determination by the order or decree attacked. Hartford Kosher Caterers, Inc. v.Gazda, 165 Conn. 478, 486, 338 A.2d 497 (1973); Stevens'Appeal, supra, 157 Conn. 581. Inasmuch as the motion for the appeal is made in the Court of Probate and forms a part of the proceedings in that court, no amendment to it may be made in the Superior Court. The Superior Court, therefore, cannot enlarge the scope of the appeal. Sacksell v. Barrett,132 Conn. 139, 146, 43 A.2d 79 (1945); Canty's Appeal, 112 Conn. 457,458, 152 A. 585 (1930); Wildman's Appeal, 111 Conn. 683,686, 151 A. 265 (1930)." Silverstein's Appeal from Probate,
supra, 13 Conn. App. 53-54.
Further, Hall, as appellant, has the burden of proving that the Probate Court's decision was in error. Mulcahy v.Mulcahy, 84 Conn. 659, 660, 81 A. 242 (1911).
With this legal landscape as the backdrop, the court must evaluate whether the Probate Court was correct in its judgment that Marcelle Hall, as executrix of the estate of Julian Altman, had no right, individually, to appropriate the Gibson from the estate and retain the "finder's fee" from Lloyd's of London.
III. FACTS
Judge O'Grady, in his memorandum of decision of October 11, 1991, made the following findings of fact. Based upon the evidence, this court adopts these factual findings[2] and will supplement them at appropriate intervals to reflect the fascinating testimony at trial. "The decedent, Julian Leon Altman died August 12, 1985 at age sixty-four while CT Page 11494 incarcerated in the Litchfield County Correctional facility located in Torrington, Connecticut.[3] Prior to his incarceration Altman resided in Bethel, Connecticut.
The Last Will and Testament of Altman was executed on July 19, 1985. He bequeathed certain shares of stock to this widow, Marcelle Altman a/k/a Marcelle Hall, and he divided his jewelry among Hall and his daughter, Sherry Altman Schoenwetter. The remainder of his estate was divided equally among Hall, Schoenwetter and his sister, Sylvia Altman. An Application for Probate of Will was filed September 25, 1985 by Marcelle Hall and a Decree Granting Probate of the Will was issued October 15, 1985 and Hall was appointed Executrix. The Inventory and S-2 Succession Tax Return were filed May 15, 1986. The Inventory reflected assets of $39,624.44. The Connecticut Department of Revenue Services issued its Certificate of no Tax due on June 6, 1986, subject to the case being reopened if additional taxable transfers were discovered.
The estate had little probate activity from June 6, 1986 until February 6, 1991 when the Executrix filed an interim accounting for the period October 15, 1985 through February 28, 1990. The interim account was prompted by the Probate Court's inquiries as to the status of the estate as well as complaints made by Sherry Altman Schoenwetter. Notice of hearing of the interim account was given to the necessary parties on February 14, 1991. The Probate Court was subsequently notified by Sherry Altman Schoenwetter of her objection to the accounting.
The basis of the objection was an alleged omission in the account by the fiduciary, Marcelle Hall, of the value of a finder's fee relating to a certain musical instrument, a Stradivarius violin known as the `Gibson', which the decedent allegedly possessed at the time of his death.
According to newspaper accounts at the time, the Gibson was stolen in 1936 from a world renowned violinist named Bronislaw Huberman while he was in concert at Carnegie Hall in New York City. The Gibson was insured by Lloyd's of London who paid an estimated $30,000.00 on the loss. [By paying on the policy, Lloyd's succeeded to the rights of Huberman as the title owner of the Gibson.] Authorities never solved the crime. After Altman's death in 1985, Marcelle Hall took CT Page 11495 possession of the instrument, verified its authenticity, negotiated its return to Lloyd's of London and received a finder's fee of $263,475.75 on February 26, 1988 equal to 25% of the value of the violin. Hall did not include this sum among the estate's assets. The return of the Gibson to Lloyd's generated much publicity and Hall was interviewed by the media on several occasions.
The Probate Court held an evidentiary hearing on April 2, 1991 and on other various and diverse dates to determine the validity of the objection. The Court heard testimony from two witnesses, Marcelle Hall, the widow, executrix and a beneficiary under Altman's will, and Sherry Altman Schoenwetter, the daughter and also a beneficiary under Altman's will. The other heir, Sylvia Altman, was deceased and no party or representative appeared on her behalf after due notice was given.
The testimony elicited at the hearing showed that it is uncontradicted that Altman possessed during his lifetime and certainly at the time of his death the Gibson. Testimony by Sherry Schoenwetter revealed that she recalled seeing it many times as a young girl in her father's care, custody and control. Marcelle Hall testified that she had known Julian Altman for many years and that she saw it and heard Altman play it on numerous occasions during their long-time relationship. There are also photographs and newspaper accounts of Altman and the Gibson. Schoenwetter testified that she never knew that the violin was the Gibson until Hall's discovery. Marcelle Hall testified she also did not know of the Gibson and that Altman had always been vague about the violin. Hall further stated shortly before Altman's death in prison, that Altman instructed her to retrieve the violin from his personal effects and to look inside the inner case for clues as to its history. Hall further testified that after Altman's death she took steps to verify the identity of the instrument and experts concluded that the violin was a genuine Stradivarius and the `Gibson'." At this point the Probate Court articulated its finding that there was no evidence as to Julian Altman's ownership interest in the Strad. At trial, however, Hall testified in detail how Altman schemed with his mother to steal the priceless Gibson, as will be set forth in more detail, infra.
The Probate Court framed the issues in the case as CT Page 11496 "whether Altman was the owner or possessed the Gibson at the time of death and whether its value or finder's fee are properly includable in his estate and must be accounted for the purposes of the imposition of the Connecticut Succession Tax under Chapter 216 of the Connecticut General Statutes."
The probate court found that Julian Altman was the possessor of the Gibson at his death. "There is irrefutable evidence that Altman possessed and enjoyed the Gibson for may years during his lifetime." Despite the probate court's unwillingness to point the finger at Altman for stealing the Strad, it found that "Altman had a legal interest in the Gibson" at his death.
"Marcelle Hall was appointed Executrix of Altman's estate on October 15, 1985. As Executrix, Hall was charged with the duty to inventory and account for all the property of the deceased, Connecticut General Statutes § 45a-341. The property to be inventoried includes tangible and intangible personal property. Therefore, the inventory of May 15, 1986 should have included the value of the Gibson and any inventories subsequent to the return to Lloyd's should have included the finder's fee.
Sometime between Altman's death and February 26, 1988, Hall in her individual capacity and not as Executrix contacted Lloyd's of London regarding the return of the Gibson to Lloyd's in exchange for Hall being paid a finder's fee. It is Hall's contention and belief that Altman stole the Gibson and its value or finder's fee should not be a part of Altman's estate. The basis of her argument is that a thief cannot profit from his crime. . . . Hall also alleges that Altman did not possess the Gibson when he died, however there was no evidence or testimony to suggest that Altman conveyed it to her. Hall had no lawful right to possession of the Gibson other than as Executrix. The Gibson was part of Altman's personal property. Therefore, the violin as well as the right to any finder's fee passed to Altman's estate at his death.
The right to possession of the Gibson devolved to Hall only in her capacity as Executrix. The right to the use and enjoyment of the violin which Altman had during his lifetime included the right to enter into a contract to receive a finder's fee for the return of the violin. This right constituted an item of intangible personal property that CT Page 11497 passed to Altman's estate."
Based on the foregoing facts, the Probate Court concluded that "[u]nder Connecticut General Statutes § 12-341b(d), the right to contract for a finder's fee constituted an intangible property interest by gift or grant intended to take effect in possession or enjoyment at or after the death of the transferor. Such a transfer is taxable and properly includable in the estate of Julian Altman.
Therefore, the Court grants the objection to the interim account and rejects the Executrix's interim accounting for the period October 15, 1985 through February 28, 1990. The Court further orders a new accounting be filed no later than November 1, 1991, and that the Executrix post bond in the amount of $300,000. immediately." It is from this decision that Hall appeals.
The court relies on these factual findings since there was ample testimony at trial to support them.[4] In order, however, to gain a greater flavor for the long-secreted facts of this case, the court will supplement the foregoing findings with the evidence presented during the trial of this matter.
In 1946, Marcelle Hall, then Marcelle Meyer, married Robert S. Hall, a former minister at the Methodist church on Main Street in Danbury. After 24 years of marriage they were divorced. As part of her divorce settlement, Marcelle received a piece of property in Bethel. Thereafter, Marcelle Hall moved to Washington D.C. where she met a violinist playing at the Georgetown Inn and the Jefferson Hotel by the name of Julian Altman. The couple began living together almost immediately. At the time they met, Altman was playing for "scale," a low wage designated by the union. Although Altman apparently loved to play the violin, he did not prosper financially as evidenced by the meager assets of his estate. During the couple's relationship, Altman continued to play the Strad at recitals, concerts and most often at restaurants, although he never had the Gibson insured. To Marcelle's knowledge, Altman never represented to anyone, including her, how he acquired the violin. He never revealed that it was a Strad, although Marcelle could tell it was a valuable instrument by "ear." She had an affinity for violinists and their music. CT Page 11498
The frequency with which Altman performed lessened during the years and in 1983, the couple moved to the Bethel property. Shortly thereafter, Altman was convicted of sexually abusing Marcelle Hall's granddaughter, and incarcerated. On the advice of counsel, Marcelle Hall and Julian Altman were finally married on March 24, 1985 while Altman was jailed in Litchfield. The event was precipitated by Altman's failing health; in 1985 he was diagnosed with stomach cancer.
Marcelle Hall, now 77, is a charming woman whose spunk belies her age. Along with that spunk is a story more dramatic than the most contrived T.V. mystery show, which has the ring, in most part, of irrefutable truth. At trial, Hall revealed the following facts.
One day in 1985, Marcelle went to visit Altman at the Charlotte-Hungerford Hospital in Torrington, Connecticut. Upon arriving at the hospital, Altman instructed Marcelle to obtain his violin from Ed Wick.[5] The violin was contained in a leather case enclosed in a zippered protective canvas sheath.[6] Inscribed on the leather violin case was "Julian L. Altman, 703 University Boulevard, West Silver Spring, Maryland. 20901. (301) 503-1170." Altman instructed Marcelle Hall to open the canvas case and look at the materials between the outer shell of the violin case and the canvas cover.
The case contained numerous documents, marked Plaintiff's Exhibit 2 collectively. The most telling documents found by Mrs. Hall were photocopies of several newspapers from 1936.The New York Times headline from February 29, 1936, at p. 10, read "Huberman Violin Stolen at Carnegie," "$30,000 Stradivarius is Taken From Dressing Room While Musician Is on Stage." "No Clue to Thief Found", "9 Bows Valued at $1,500 Each and Easy to Dispose of Passed Over by Criminal." A copy of The New York Evening Post article from February 29, 1936, at p. 3, reads "Stradivarius Violin Stolen At Carnegie Hall Concert," "$30,000 Instrument Taken From Dressing Room as Bronislaw Huberman Plays." The New York Herald Tribune, from February 29, 1936, at p. 2, reads "Stradivarius Stolen at Recital At Carnegie Hall", "Violin Insured for £ 6,000 Vanishes as Bronislaw Huberman Is on Stage." "Bows Worth $9,000 Left", "Instrument Taken in 1919 in Vienna, Thief Caught."
In addition, the canvas case contained a publication from CT Page 11499 September, 1977 called The Strad, "a monthly journal for professionals and amateurs of all stringed instruments played with the bow." Altman had highlighted a portion of the magazine in pink, that reads as follows: "The `Gibson' Stradivari of 1713-named after George Alfred Gibson, a famous English violinist, and belonging to Bronislaw Huberman, was stolen in 1919 from his room at a hotel in Vienna. This instrument was in a double case which also contained several valuable bows and another Cremonese violin. The police were informed, and within only a few hours of the theft the instrument was reported as having been offered to a Viennese dealer, and the thief caught red-handed. However this same violin was unfortunately stolen a second time in 1936 from the dressing room of Carnegie Hall in New York where Huberman was performing. He had the instrument fully insured and was paid full compensation for its loss, but the violin has never been heard of since. . . . Bronislaw Huberman at the Hyde Park Hotel, London, had been flourishing a cheque he received from Lloyd's for £ 8000 insurance he collected for the loss of his Strad in New York. He told me that while he was on the platform with the New York Philharmonic playing a concerto, his reserve fiddle was stolen from the artists' room. He immediately notified Lloyds (sic) by cable and hurried over to collect." Id., 409-11.
The case also contained a pamphlet on the proper care of a violin, an article written by Herbert K. Goodkind on Stradivarius iconography and a carbon copy of a letter that Altman had written to his mother.
After reviewing these materials, Ms. Hall returned to the hospital, shocked, and asked Altman "`Are you trying to tell me that this violin you've been [playing] all this time is the Gibson?'" "And he said, `Yes.'" "So then, I asked him, `How did you ever get your hands on it?' And he said, `Well, I had this buddy and he came into the Russian Bear[7] one night, opened his coat, took out a violin and said, "I have just stolen this violin from Carnegie Hall, and I'm in need of a hundred bucks. I've got to get my hands on it right away. Do you suppose you could go around and collect — '" `Cause nobody had — These young violinists and — Never had a hundred bucks in those days. And he said `Could you go around to the various — Try the waiters and see if you can collect some money.' And Julian went and borrowed $5 here an $10 here and handed it to him. He said, `Now, I'll tell you what I'll do. CT Page 11500 I'll let you take the violin. You take it to your boss and see if he can unload it, and if he can, we'll split the take three ways.' And so, he left the violin."
"He left the violin — This is what Julian told me. The first story. He left the violin with him and the next day the boss said to him, `You better ditch that thing. It's in every newspaper in New York.' And so, he ditched it by playing it for fifty-one years."
Ms. Hall's counsel then asked her whether she believed Altman's story. She responded "No, I didn't. But I asked him. I said, `What is this buddy of yours look like?' And he said, `Well, he has dark brown hair, brown eyes. He's a devil with the ladies. He's a gambler.' And he said, `Whenever we would get short of money, he would go — We'd go to Grand Central Station and pi — And he would pick pockets.' And I looked at him and I said, `Sounds to me like your describing yourself.' And he said, `that's not a very nice thing to say.' . . . [A]nd he said, `you're right, though.' And that's when he started to tell me, as he called it, `The Secret of My Violin.' And that was his way of putting it to me." Thereafter, during Hall's subsequent visits to the hospital, Altman would recite to her the various secrets of the violin.
"He told me that he and his mother had conspired to steal a violin and that they had finally come to the conclusion because it was her idea that the — The violinist should have two violins and he should also not live in the country because if he lived in the United States he would stay and see if everything was — If — If he could get the violin back, and he would be very unhappy." In order to perfect the conspiracy, Altman and mom, as he called her, would review newspapers and do background research, always over a glass of tea, to determine when an unsuspecting target would be in the vicinity. "She finally moved them to — As close to Carnegie Hall and Steinway Hall as she could because this was always in the back of her mind, to get him the kind of violin she thought he needed."
They finally found their prey in Bronislaw Huberman, since he had two violins and lived out of the country. The plan was for Altman to tell his boss that he left his Bromo seltzer at home, since he always had stomach pains, so that a CT Page 11501 window of opportunity could be created. Then he would walk over to Carnegie Hall with cigars in hand to use to bribe the guards. "[H]e was well known in Carnegie Hall because he played there often with the — With the — One of the Youth Symphonies. And he could get into it very easily, because they all knew him. So, he walked in, gave [the] guard a nice cigar, went to the other — To the bottom of the stairs, and he said that he had brought a cigar for that guard and it was known among his crowd that if you wanted to, you could give the guards or — the — the whatever — ushers. Give the guards a — a cigar or a pack of cigarettes and they would — If you told them you — `Go ahead. Have a smoke.' They would stand in the place where the guard was. And, he did that. He gave the guard a nice Havana cigar, and — and the guard looked at him, say, `Thank you, Mr. Julian.' . . . [Julian said] `Do you feel like having a smoke?' And [the guard] said, `Sure, I do.' [Julian] said, `I'll watch [the door] for you. Go ahead. Everything's cool.'" Julian then "went up the stairs. The guard left. He went up — ." "He went up the stairs, opened his coat, had the violin, put it under his coat, went downstairs, stood next to Miss Ipican, Huberman's assistant."
"And, as soon as they finished the big number with the forty-one instruments, they all started to come off, he went over to the side where he could exit to the front of Carnegie Hall, and nodded to a few people on the way. And then went up the outer exit, got a taxi, got in, went — Took it to his apartment. His mother was waiting. She had the medicine in her apron pocket and had the keys to his bedroom. He always locked his bedroom. Had it unlocked. He went in, put the violin on the bed, he took the medicine, went out to the cab, went back to the Russian Bear."
As evidenced by the death bed recitals to Hall, Altman's whole life was a fraud. Every time he pulled the Gibson out of its canvas protective case he must have rustled the newspaper clippings and other papers stuffed in the cover, detailing the mysterious theft of the Stradivarius. It brings to mind the pitiful lament of Lady MacBeth who cried out: "Will all great Neptune's ocean wash this blood clean from my hands." William Shakespeare, MacBeth act 2, sc. 2. On his death bed, after a life of silence, however, Altman was finally redeemed by revealing his inner-most secret of the violin. Thereafter, on August 12, 1985, Altman died. CT Page 11502
In the car, after Altman's funeral, his daughter Sherry asked Marcelle Hall whether she would consider letting her (Sherry) keep the violin. Marcelle said no. Marcelle's initial inclination was to donate the violin to Western Connecticut State University. This idea, however, was short lived. Hall's rendition of the meeting with Sherry is a little different. Hall testified that "I had gone to the cemetery with [Sherry] while she placed flowers on his grave before the funeral at St. James and as we left, she said, `I suppose this is not a good time to ask you for my father's violin — I'd love to have it.' By this time of course, I knew the whole story [about the secret of the violin] and said, `You're right, It's not a good time.'" Hall never turned the violin over to Sherry.
Thereafter, Hall endeavored to authenticate the Strad by taking it to Rachel Goodkind, whose father was the Stradivarius iconographer identified in one of the documents Altman had left in the canvas case. Goodkind enlisted the assistance of a violin expert in New Jersey named Dario D'Atilli who advised Hall concerning the Gibson.
After conferring with D'Atilli, Hall retained her cousin, Harold Foster, a lawyer in Norwalk, to negotiate the return of the Gibson to Lloyd's of London. In return for the Strad, Foster secured a "finder's fee" of one quarter of the sale price fetched for the violin. It took some time, but the agreement was reduced to writing in 1987. Plaintiff's Exhibit 3. On February 12, 1988, the Gibson was sold for $1,200,000. Of that amount, on February 26, 1988, Marcelle received $237,128.18 and her attorney received $26,347.57. Ms. Hall reported the income on her federal tax return for the tax year 1988.[8] Plaintiff's Exhibit 5.
Shortly after Hall contracted with Lloyd's for the return of the Gibson, Sherry testified that she called Marcelle. "In that telephone conversation, when she told me that the violin was a stolen violin, that she was going to return [it] to Lloyd's of London and that she would receive a finder's fee, she told me that she intended to be fair about the finder's fee and that she would share that fee with me and my aunt." Marcelle Hall denies that the foregoing conversation took place. CT Page 11503
In connection with the Gibson being turned over to Lloyd's, Hall never revealed her knowledge that Altman had, himself, stolen the Strad. Rather, she stuck by the story that Altman's "buddy" had stolen the fiddle from Huberman at Carnegie Hall and sold it to Altman in the Russian Bear for $100. In 1987, Marcelle Hall gave an interview to People magazine and did not indicate that Altman had stolen the Gibson. The reason for not revealing what she came to know as the truth was that Julian Altman's sister, Sylvia, was quite ill and "poverty-stricken." "Her beautiful Steinway piano was going through the floorboards of her house. I had a great deal of compassion for her. She had had a terrible life with her mother and her brother. And now she had had to realize that her brother was going to jail for sexually abusing my granddaughter. That was almost too much for her to bear, and I could not put on her shoulders the fact that her mother, who she loved, as most of us do of our mothers, was a crook."
This testimony, however, is impeached by a letter dated June 30, 1990, in evidence as Defendant's Exhibit 1, wherein Hall recites that Sylvia knew all along of the conspiracy between her mother and Julian. Apparently, Julian and his mother "made a tape together telling the whole story in a conversation in his office in Washington, D.C. . . . [Sylvia] was listening to some of his tapes to get a handle on some music he might need when Lo and Behold she stumbled over the tape that he and his mother had made describing the theft of the Strad. She, being the only honest member of the Altman family (except for maybe the father who had been excluded by a divorce when Julian was thirteen) threatened to expose him. I have the letter where he threatened to kill her if she didn't return the tape."
Regardless of when Sylvia came to know the truth, Hall finally began to tell the whole story, so she says, after Sylvia died. "So many people said to me it's such a fascinating story, even though they didn't know the whole story, they said, `You should write a book.'" "And then, after Sylvia died, I thought, `Yes, maybe this is the thing I should do. Maybe I should tell the whole story.' And so, that was when I decided to get my niece to help me, and we started to work on it."
On June 30, 1990, in an effort to pursue the book, Hall wrote a letter to her niece, Cathy Mears, who had offered to CT Page 11504 help her aunt get it published. In the letter Hall wrote that "[s]ince Sherry has decided to try to get her greedy little hands on the money I earned with such heartache and which the government kindly took a huge slice of by way of capital gains tax, I am now not going to be a protector of the Altman's (sic) and what I have to add [to the story] is the additional facts which Julian confessed to me and the proof of certain things found in letters. It really makes the story even more interesting than it already is." Later in the letter, Hall revealed facts that embellished upon what Mears already knew.
In 1991, Mears began to assist Hall in the preparation of a manuscript detailing the facts of the secret of Altman's violin. Throughout the collaboration, Hall insisted that Altman stole the violin. A twenty page manuscript proposal was submitted to Random House Publishing and Creative Artists publishing. On August 27, 1991, an unfavorable response was received from Random House indicating that the manuscript as "not that good." Shortly thereafter, on August 31, 1991, Mears parted ways with Hall after determining that there were some irreconcilable inconsistencies in Hall's various presentations of the story. Nothing further has come of Hall's book.
When Mrs. Hall, as executrix, finally filed an interim accounting, three years after receiving the check from Lloyd's, showing an inventory of approximately $39,000. in total assets, Sherry objected arguing that the "finder's fee" of $263,475.75 was an asset of the estate. Hall disagreed, arguing that Altman, as a thief, should not be able to profit from his crime.
The Bethel Probate Court sustained Sherry's objection and ordered Hall to account to the estate for the "finder's fee." From that order, Hall appeals to this court.
IV. MERITS OF THE APPEAL
The reasons for appeal filed by Hall argue that the "finder's fee" retained by Hall is her property and not an asset of the estate. Therefore, she postulates, she is entitled to retain the monies for her individual use and enjoyment. The court will overrule Hall's reasons for appeal and affirm the decision of the Bethel Probate Court. CT Page 11505
Despite all of her charm and the fact she operated under the guise of the legal advice supplied by her cousin, Hall was at all times acting in her capacity as executrix, or fiduciary, for the Estate of Julian Altman. See General Statutes § 45a-199 (executrix is a fiduciary); see also Papav. New Haven Federation of Teachers, 186 Conn. 725, 745 n. 15,444 A.2d 196 (1982) (fiduciary includes relationships such as executor and executrix).
"An important aspect of an execut[rix]' fiduciary responsibility is the duty to maintain an undivided loyalty to the estate. Corey v. Corey, 120 Minn. 304, 310, 139 N.W. 509
(1913); In re Estate of Rothko, 84 Misc.2d 830, 847-48,379 N.Y.S.2d 923 (1975); Estate of Stephenson, 469 Pa. 128, 141,364 A.2d 1301 (1976); see Phillips v. Moeller, 148 Conn. 361,369, 170 A.2d 897 (1961). `[O]ne interested in an estate has the right to have its representative wholly free from conflicting personal interests . . . .' Corey v. Corey, supra. When the execut[rix] of an estate places [her]self in a position where [her] interests conflict with those of the estate, the execut[rix]' ability to represent fairly the interests of the estate is irreparably tainted. `When [such] a situation appears . . . it is the positive duty of the court to remove the execut[rix] . . . .' Davis v. Roberts,206 Mo. App. 125, 129, 226 S.W. 662 (1920)." Ramsdell v. Union TrustCo., 202 Conn. 57, 65, 519 A.2d 1185 (1987). The executrix, as a fiduciary, "occupies the position of the highest trust and therefore [s]he is bound to use the utmost good faith and fair dealing in all h[er] relationships . . . ." KatzCorporation v. T.H. Canty Co., 168 Conn. 201, 207,362 A.2d 975 (1975). Hall has a duty to act with the "utmost regard" for the estate's interests. Konover Development Corp. v.Zeller, 228 Conn. 206, 217, 635 A.2d 798 (1994).
Pursuant to General Statutes § 45a-341(b)(1), Hall had an obligation as fiduciary to file an inventory listing all of the holdings of Altman's estate. As the Probate Court properly noted, "[t]he estate of a deceased person consists of property the title to or an interest in which is derived from him, which it is the duty of the executor or administrator to inventory and for which he must account to the Probate Court."American Surety Co. of New York v. McMullen, 129 Conn. 575,582-83, 30 A.2d 564 (1943).
It is undisputed that Hall took possession of the Strad CT Page 11506 from Altman after his deathbed recitation of the secret of his violin. Therefore, to put it as simply as possible, although the common law term for Hall's act of appropriating the violin is conversion, in common parlance she, as executrix, stole the Gibson and with it the $263,475.75 "finder's fee" from her deceased husband's estate. As a result, she deprived Altman's daughter, Sherry, of her rightful share of the estate's most significant asset.
In defense of her diabolical deed, Hall's attorney has argued in the Bethel Probate Court and in this court the mantra that "A thief cannot benefit from his crime." Mrs. Hall, however, fails to apply this nostrum to herself. Hall' s attorney, under prodding from the court, could not cite one case in the whole world where the second thief had greater rights than the first thief. Neither common sense or the law, or fundamental logic, supports such a position.
In an effort to bolster its common sense conclusion, the court has dug deeper than Mrs. Hall's counsel into legal arcana and found two cases,[9] each eloquent in its stark simplicity, which state the elemental proposition that governs this matter: the first thief prevails in an action against subsequent pilferers. Neither esteemed court found it necessary to explicate its barebones decision, since the proposition is so fundamental that it speaks for itself. It is worthwhile to quote each decision in full.
In Anderson v. Gouldberg, 53 N.W. 636, 637 (Minn. 1892), the plaintiff, a log bandit, brought an action against the defendant, who had apparently filched logs from the plaintiff after the plaintiff had deposited them at the mill. The court determined that "[i]t is settled by the verdict of the jury that the logs in controversy were not cut upon the land of the defendants, and consequently that they were entire strangers to the property. For the purposes of this appeal, we must also assume the fact to be (as there was evidence from which the jury might have so found) that the plaintiffs obtained possession of the logs in the first instance by trespassing upon the land of some third party [and cutting them down]. Therefore the only question is whether bare possession of property, though wrongfully obtained, is sufficient title to enable the party enjoying it to maintain replevin [for repossession] against a mere stranger, who takes it from him. We had supposed that this was settled in the affirmative as CT Page 11507 long ago, at least as the early case of Armory v. Delamirie,
1 Strange 504, [93 Eng. Rep. 664 (K.B. 1722) (Pratt, C.J.)], so often cited on that point. When it is said that to maintain replevin the plaintiff's possession must have been lawful, it means merely that it must have been lawful as against the person who deprived him of it; and possession is good title against all the world except those having a better title. Counsel says that possession only raises a presumption of title, which, however, may be rebutted. Rightly understood, this is correct; but counsel misapplies it. One who takes property from the possession of another can only rebut this presumption by showing a superior title in himself, or in some way connecting himself with one who has. One who has acquired the possession of property, whether by finding, bailment, or by mere tort, has a right to retain that possession as against a mere wrongdoer who is a stranger to the property. Any other rule would lead to an endless series of unlawful seizures and reprisals in every case where property had once passed out of the possession of the rightful owner." (Emphasis added.) Id.
In the "oft cited" case of Armory v. Delamirie, supra, 1 Strange 504, 93 Eng. Rep. 664, the Kings Bench ruled that a "Finder of a jewel may maintain trover. The plaintiff being a chimney sweeper's boy found a jewel and carried it to the defendant's shop (who was a goldsmith) to know what it was, and delivered it into the hands of the apprentice, who under pretence of weighing it, took out the stones, and calling to the master to let him know it came to three halfpence, the I master offered the boy the money, who refused to take it and insisted to have the thing again; whereupon the apprentice delivered him back the socket without the stones. And now in trover against the master these points were ruled: 1. That the finder of a jewel, though he does not by such finding acquire an absolute property or ownership, yet he has such a property as will enable him to keep it against all but the rightful owner, and consequently may maintain trover. 2. That the action well lay against the master, who gives accredit to his apprentice, and is answerable for his neglect. 3. As to the value of the jewel several of the trade were examined to prove what a jewel of the finest water that would fit the socket would be worth; and the Chief Justice directed the jury, that unless the defendant did produce the jewel, and shew it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels CT Page 11508 the measure of their damages: which they accordingly did." (Footnote omitted.)
The rule of law articulated in Anderson and Armory is particularly cogent where the second miscreant is acting in a fiduciary capacity as Hall was here.
Applying the well settled law to the facts of this case, Sherry Schoenwetter, Sylvia Altman and the estate should prevail. Julian Altman had possession of the Strad at his death. This possessory property interest is superior to all those except the owner of the property, now Lloyd's of London. Hall's return of the Gibson to Lloyd's and subsequent retention of the "finder's fee" amounted to an unlawful theft of the estate's property and a concomitant violation of her fiduciary obligations to the estate. As a result, the Bethel Probate Court was correct in sustaining Schoenwetter's objection to the interim accounting that did not include the "finder's fee". Therefore, the estate, as holder of a superior interest in the "finder's fee", deserves reimbursement in full from Hall.
V. CONCLUSION AND ORDER
Accordingly, the court affirms the decision of the Bethel Probate Court and orders Marcelle Hall to restore to the estate of Julian Altman, and account for the same, the sum of $263,475.75 plus interest at the rate of 10%; see General Statutes § 37-3a; from the date of her receipt of the disbursement from Lloyd's of London, to the present. The proceeds from the deal with Lloyd's, clearly, both legally and morally, to the extent that there is any morality in this case, belong to the estate of Julian Altman.
T. Clark Hull, State Trial Referee