TIMOTHY R. E. KEENEY, COMMISSIONER OF
ENVIRONMENTAL PROTECTION *v.*
THOMAS D. BUCCINO ET AL.
(AC 25825)

Dranginis, McLachlan and Harper, Js.

Argued September 27—officially released December 6, 2005

*Francis A. Miniter*, for the appellants (defendants).

*Krista E. Trousdale*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Kimberly P. Massicotte*, assistant attorney general, for the appellee (plaintiff).

*Opinion*

DRANGINIS, J. The primary issue in this appeal is whether the court properly found the defendants Thomas D. Buccino and Irma L. Buccino to be in indirect civil contempt for their failure and refusal to make all repairs to Hall's Pond Dam (dam) in wilful violation of the stipulated judgment, rendered pursuant to an agreement between the defendants and the plaintiff, the commissioner of environmental protection.[1] We affirm the judgment of the trial court.

I

PROCEDURAL HISTORY

The record discloses that this appeal had its genesis more than fifteen years ago, when the commissioner, acting pursuant to General Statutes § 22a-401 et seq., issued order 90-016 (1990 order) requiring the defendants to make certain repairs to their dam. The 1990 order stated that the defendants were the owners of the dam[2] located on the easterly side of Route 32 in Willington. The commissioner had jurisdiction over the dam because if it were to break away, it would cause damage to the mill complex adjacent to it, the local fire station and a large barn, and possibly could cause loss of life. A department of environmental protection

[1] At the time the action was commenced, Timothy R. E. Keeney was the commissioner of environmental protection and was joined as the plaintiff in his representative capacity. During the course of this litigation, several individuals have succeeded Keeney in seriatim as commissioner. In this opinion, we refer to the plaintiff as the commissioner.

[2] The defendants own the dam but not the pond behind it.

(department) investigation found that the dam was in an unsafe condition requiring remedial work to assure its integrity.

An administrative hearing regarding the 1990 order was held before a department hearing officer, who concluded in September, 1992, that the dam was in an unsafe condition and affirmed the 1990 order with certain modifications. The hearing officer also ordered, among other things, that the defendants submit an application to repair or to remove the dam by October 5, 1992, and perform certain maintenance by December 1, 1992. By summons and complaint dated October, 1993, the commissioner sought an injunction against the defendants for their failure to comply with the 1990 order. The parties resolved the matter by entering into a written agreement. On May 31, 1995, the court, *Hon. Robert Satter*, judge trial referee, approved the agreement signed by the parties and rendered a stipulated judgment thereon.

At the time of the stipulated judgment, the defendants had pending before the department application 95-007 for a permit to repair the dam. Several days after the judgment was rendered in accordance with the stipulated judgment, the defendants withdrew application 95-007 and filed, in its stead, application 95-009 for a permit to remove the dam by draining Hall's Pond. The commissioner considered application 95-009 to be noncompliant with the stipulated judgment and filed a motion for contempt on October 3, 1995 (first motion for contempt).

The court, *Sheldon, J.*, held a hearing on the first motion for contempt and found that application 95-009 did not comply with the stipulated judgment because it did not seek a permit to repair or to remove the dam. The court did not find the defendants to be in contempt of the stipulated judgment because it was not persuaded

that their noncompliance was wilful. At the time, it appeared that the department was still considering application 95-009 on its merits and had not rejected it. The court reasoned that because the stipulated judgment required the commissioner to inform the defendants if application 95-009 was unacceptable, the defendants could not be faulted for waiting for the results of the review. The court, however, established a time line for the commissioner to communicate objections to application 95-009 to the defendants and for the defendants to respond by submitting a suitably modified application to repair or to remove the dam. Neither party appealed from the court's judgment denying the first motion for contempt.[3]

Subsequently, the department returned application 95-009 to the defendants, and the defendants submitted a new application for a permit to repair the dam, application 95-018. In application 95-018, as they did in application 95-009, the defendants proposed to lower the spillway of the dam by nineteen inches so that all of the water from a 100 year storm could pass safely over the dam, leaving one foot of freeboard on the dam. After reviewing application 95-018, the commissioner issued a notice of tentative determination to grant the application and to published notice thereof.

On April 30, 1996, members of the Willington Fish and Game Club (club)[4] filed a petition with the commissioner, requesting a public hearing on application 95-018. At the hearing, the club presented expert testimony concerning a hydrographic and hydrologic analysis of the dam and its environs. The club's analysis tended to establish that there was no need to lower the spillway because the dam was situated and constructed in such

---

[3] The denial of a motion for contempt is a final judgment for purposes of appeal. See, e.g., *Willocks* v. *Klein*, 38 Conn. App. 317, 320, 660 A.2d 869 (1995).

[4] The club owns the land under Hall's Pond.

a way that water from a 100 year storm could pass safely over the dam without endangering life or property downstream. At the public hearing, the commissioner, the defendants and the club agreed that application 95-018 should be approved, except insofar as it called for a lowering of the spillway. Accordingly, on April 2, 1997, the commissioner issued permit 95-018, expressly authorizing the defendants to make the following repairs to the dam: remove the water wheel from the spillway, remove all trees from the dam's embankment, remove the flashboards and their supports from the spillway, install a gravel filter blanket at the toe of the embankment, grout the voids in the masonry spillway and its channel walls and install weepholes in the stone masonry channel walls located in the seventy-five foot area downstream of the spillway.

Under the terms of permit 95-018, the defendants were required to perform all of the authorized repairs within 120 days. The defendants made some of the repairs, but failed to make others. Specifically, the defendants removed the waterwheel and flashboards from the spillway and cut down many, but not all, trees on the dam's embankment. They did not remove the flashboard supports from the spillway, install a gravel filter blanket at the toe of the embankment, grout voids or install weepholes in the spillway channel downstream. On May 2, 2003, the commissioner filed a second motion for contempt, alleging that the defendants had failed to repair the dam. The defendants filed an objection to the second motion for contempt, asserting five reasons why the motion should be denied.[5]

---

[5] The defendants argued that (1) under the terms of the stipulated judgment, they could either repair or remove the dam, (2) they had planned to remove the dam as proposed in application 95-018 by opening the gates of the dam and draining off water from the pond, (3) the projected cost of removing the dam would be much lower than the projected cost of repairing it, (4) since the date of the stipulated judgment, the parties have determined that contrary to their understanding at the time they entered into the agreement, the dam, as constructed, is capable of safely passing the water

The second motion for contempt was referred to Judge Sheldon, who tried the matter in two phases. The court held an evidentiary hearing on June 24, 2004, at which the defendants were represented by counsel who had represented them since the commissioner had initiated enforcement proceedings. Just prior to the hearing, the defendants, through counsel, agreed that they would not claim that they were unable to pay for the repairs that they had not undertaken. In exchange, the commissioner agreed not to pursue a subpoena duces tecum for the defendants' financial records.[6]

At the hearing, the court heard testimony only from Wesley D. Marsh, supervising environmental analyst at the department, and received documentary and photographic evidence concerning the dam's condition and the commissioner's efforts to compel the defendants to remove or to repair the dam since the late 1980s. After the parties rested, the court ordered them to submit briefs and to appear for oral argument on August 1, 2003. The focus of the defendants' objection to the second motion for contempt at the evidentiary hearing, in their briefs and at oral argument, was that there was no need to perform the repairs authorized by permit 95-018 that had not been completed because subsequent to the time the stipulated judgment was rendered, the parties determined that water from a 100 year storm could pass safely over the dam.

During the luncheon recess on the day of oral argument, the defendants met with their counsel of long standing. When court reconvened, counsel represented to the court that a conflict of interest had arisen between the defendants and himself concerning the

from a 100 year storm and (5) given the dam's ability to pass safely the water from a 100 year storm, the repairs authorized by permit 95-018 are not necessary to preserve the dam's integrity and function.

[6] Judge Sheldon concluded, therefore, that the defendants' motion to quash the subpoena duces tecum was moot.

formers' understanding of the agreement as he had explained it to them before they signed it. Thomas Buccino claimed that counsel had informed him that upon stipulating to judgment and paying the agreed on fine, the defendants could avoid paying any more money to repair or to maintain the dam by simply applying for and obtaining a permit to remove the dam by opening its gates and draining water from the pond. In light of Thomas Buccino's claim that counsel's explanation was at variance with the express terms of the agreement, counsel asked to withdraw so that other counsel could enter an appearance on the defendants' behalf. Judge Sheldon suspended further proceedings until counsel's motion for permission to withdraw could be filed in writing and referred to another court.[7]

When new counsel appeared for the defendants, he filed a motion to open the hearing so that Thomas Buccino could testify as to his original understanding of the agreement and his efforts to comply with the terms of the stipulated judgment as he understood them. Judge Sheldon granted the motion to open over the objection of the commissioner in order to resolve any doubt raised by new counsel that original counsel had not called Thomas Buccino to testify during the evidentiary hearing on June 24, 2003, to avoid exposing the conflict of interest between himself and the defendants, i.e., that he had misinformed them as to their rights and responsibilities under the agreement.

Due to Thomas Buccino's poor health and the fact that he was then residing in Florida, it was not possible for a further evidentiary hearing to take place. The court urged the parties to agree to an alternative procedure to present Thomas Buccino's testimony, which they did. In lieu of a hearing, the parties submitted to the court

---

[7] The court, *Booth, J.*, subsequently granted counsel's motion for permission to withdraw.

a copy of the transcript of Thomas Buccino's deposition and his affidavit, along with supplemental briefs from both counsel.

## II

## JUDGMENT OF CONTEMPT

On the basis of the evidence and the arguments of the parties, Judge Sheldon made findings of fact consistent with the foregoing recitation of the procedural history. The court found specifically that, under the terms of the stipulated judgment, the defendants were enjoined permanently from violating the provisions of chapter 446j of the General Statutes. Furthermore, they were required (1) to retain one or more qualified consultants acceptable to the commissioner to prepare all documents, and to implement and to oversee all actions required by the stipulated judgment, (2) to submit to the commissioner on or before June 21, 1995, a complete and sufficient dam permit application to repair or to remove the dam as required by the commissioner's September 2, 1992 final decision, (3) within 120 days of the commissioner's issuing a permit, to complete all of the repairs authorized by the permit, (4) upon notification by the commissioner that any document submitted or action performed by them pursuant to the stipulated judgment was deficient, to correct all deficiencies within the time specified by the commissioner, (5) to pay a civil penalty of $10,000 and (6) to pay a penalty of $500 per day per violation for each and every violation of the injunctive provisions of the stipulated judgment. Also, the stipulated judgment provided that if the defendants knew that they had not or might not comply timely with any requirement of the stipulated judgment, or document referenced therein, they were to notify the commissioner immediately and to take reasonable steps to ensure that any failure to

comply or any delay was avoided or minimized to the greatest extent possible.

The court further found that Thomas Buccino claimed in his affidavit that he did not read the agreement before he signed it on May 31, 1995, as he claimed to be a "slow reader" and stated that he was under "a lot of pressure to get things done to avoid a trial."[8] Thomas Buccino first read the agreement "some time later at home" and "focused on the provision allowing removal of the dam, because that is what [he] wanted to do." The court found that he did not read the agreement carefully before he signed it in the presence of counsel on May 31, 1995, and that his intention was to spend as little money as possible to satisfy the commissioner's long-standing demands. When Thomas Buccino signed the agreement, he did so with the intention of filing an application to remove the dam by simply opening its gates and draining the water from Hall's Pond.

The court, however, did not accept Thomas Buccino's claim that at the time he signed the agreement he was assured by his counsel, the assistant attorney general representing the commissioner and Marsh that if he stipulated to judgment, all he would have to do, in

---

[8] Thomas Buccino attested, in part, that he signed the stipulation for judgment under the following circumstances. "On May 31, 1995, at the Washington Street Courthouse [in Hartford, defendants' counsel, Robert B.] Cohen told me I should sign a document entitled Stipulation for Judgment. I had not previously seen the document. I believe it was prepared not long before we came to court that day. Attorney Cohen told me at that time that if I paid a fine of $10,000, I would be able to get a permit to remove the dam. This was very important to me, as I did not have other money to repair the dam, and I wanted to end my responsibility for the dam. Mr. Marsh of the [department], [assistant attorney general Krista E.] Trousdale [of the attorney general's office] and Attorney Cohen told me to put the notice of Permit Application in the Hartford Courant, which I did . . . and if no one contested it, we could open the control gates to the 4 foot penstock and the 2 foot by 2 foot spillway culvert and we would not have to repair the dam. On that basis I signed the document."

addition to paying a $10,000 fine, would be to file an application for a permit to open the dam's gates and drain the pond, which would be approved if no one opposed the application. The court rejected Thomas Buccino's claim for three reasons. First, the court knew that both counsel had participated in the drafting of the agreement and were thoroughly familiar with its terms. The court found that both counsel were professional and well prepared throughout the case. The court found no credible evidence that either counsel misled the defendants as to their obligations pursuant to the stipulation for judgment. Both counsel knew that the commissioner had power to approve or to reject any dam permit application and that the defendants would have no choice but to comply with the terms of any permit the commissioner issued. The defendants could not assume that their application to remove the dam by opening its gates and draining the pond, even if unopposed by the public, would be approved.

Second, the court concluded that it was not in the interest of either counsel to mislead the defendants as to the nature of the agreement. To the contrary, both counsel had strong interests in making sure that the defendants understood their obligations in light of their long history of failing to comply with the commissioner's orders. Counsel for the commissioner had every reason to believe that the defendants would not comply with the stipulated judgment if its terms were unclear. Counsel for the defendants had reason to expect that the defendants would incur large fines if they continued to fail to comply with the stipulated judgment.

Third, Thomas Buccino testified about his signing of the agreement at a deposition more than two months before he executed his affidavit. His deposition testimony undermines his claim that before he signed the agreement his original counsel misled him as to the

contents thereof.[9] The court found Thomas Buccino's oral testimony to be self-serving and incredible. The court therefore concluded that no one had misled the defendants as to the nature and substance of their obligations under the agreement.

The court also found that under the terms of permit 95-018, the defendants were to perform all of the repairs authorized therein within 120 days. Contrary to the defendants' claim that they could not perform the repairs without the approval of the United States Army Corps of Engineers (corps of engineers), the court found that such approval was unnecessary. In application 95-018, the defendants proposed lowering the spillway of the dam, which would have changed permanently the level and volume of Hall's Pond, and would have needed the corps of engineers' approval to do so. Permit 95-018, however, did not authorize lowering the spillway. Thus, the corps of engineers did not have to approve any authorized repairs to the dam.

The court found, on the basis of Marsh's testimony and Thomas Buccino's admissions in his deposition and

---

[9] The court found the following facts with respect to Thomas Buccino's deposition testimony. "When asked at his deposition if he had had any presigning conversations with [his counsel, Robert B.] Cohen about the stipulation for judgment, the most [Thomas Buccino] would say initially was that such conversations had 'probably' occurred, though he could not recall when they had occurred. . . . Thereafter, however, when asked if attorney Cohen had ever told him in any such conversation exactly what the stipulation for judgment required of him and his wife, he backed off his initial suggestion that that had 'probably' happened . . . insisting more than once that he could not remember if it ever had. . . . In fact, Mr. Buccino's only claimed memory of any presigning conversation with attorney Cohen concerning the stipulation for judgment was of an ambiguous colloquy between them, in which he claimed that he sought and received the latter's verbal assurance that, if he stipulated to judgment, 'there would be no surprises.' Mr. Buccino claims that he took this assurance to mean that if he signed the stipulation for judgment and paid the $10,000 fine, he could fully satisfy the judgment by simply obtaining a permit to open the dam's gates and draining Hall's Pond." (Citations omitted.)

affidavit, that the defendants performed some but not all of the repairs authorized by permit 95-018. During his deposition, Thomas Buccino testified that the only reason he had not made the repairs was that none of them would be necessary if, as he still intended, the dam was removed by opening its gates and draining the pond. By Thomas Buccino's logic, the purpose of the repairs was to preserve the integrity and function of the dam in the event of a 100 year storm,[10] but the repairs were not necessary if the dam was removed. The court concluded that Thomas Buccino's logic demonstrated that he always understood what the stipulated judgment required of the defendants, but for his own reasons, he never intended to comply with the terms of the judgment.

The court found that when it suited his interests, Thomas Buccino offered quite different, if not completely contradictory, explanations for not having made all of the required repairs. For example, he claimed that he did not install the gravel blanket at the toe of the embankment because, with the removal of several trees, the sun kept the area dry, and he had not removed the flashboard supports from the spillway because he had never seen them obstruct the flow of water.

Of procedural note, the court found that on March 25, 1999, the defendants filed a motion to set aside or to open the stipulated judgment. The court found that the defendants had filed the motion almost two years after the commissioner had issued permit 95-018 and almost twenty months after the defendants were to have completed the required repairs. The defendants founded their motion to open on the theory of a mutual mistake of fact, i.e., the water from a 100 year storm

---

[10] The court found, pursuant to Marsh's testimony, that each of the repairs authorized by permit 95-018 and not yet performed by the defendants is necessary to preserve the integrity and function of the dam.

could not pass safely over the dam. They relied on the evidence presented by the club at the public hearing on application 95-018 and with which all parties agreed. The defendants therefore claimed in the motion to open that none of the repairs contemplated by the stipulated judgment were necessary and that they should not be required to pay for them. The motion to open also claimed that the stipulated judgment is unenforceable because it called for the spillway to be lowered by nineteen inches, action which required special permission from the corps of engineers. Although they had filed the motion to open in 1999, the defendants had made no effort to have it adjudicated during the four years prior to the commissioner's filing the second motion for contempt.

On the basis of the foregoing factual findings and the relevant law of indirect civil contempt, Judge Sheldon drew the following legal conclusions. The defendants wilfully violated the stipulated judgment by failing and refusing to make all repairs to the dam as authorized by permit 95-018 within 120 days of the permit's issuance. The judgment applies to them directly, as it was premised on their having signed the agreement. The defendants do not dispute that permit 95-018 was issued to them by the commissioner pursuant to General Statutes § 22a-403 or that some of the authorized repairs were not completed.[11] The defendants' failure and refusal to make all of the repairs within 120 days of the permit's issue directly violated the clear terms of the agreement and, thus, the stipulated judgment rendered by Judge Satter. That the defendants' failure to complete all of the repairs was wilful is demonstrated by

---

[11] The defendants failed to remove all of the trees from the embankment and the flashboard supports from the spillway, to install a gravel filter blanket at the toe of the embankment, to grout the voids in the masonry spillway and spillway channel walls, and to install weepholes in the stone masonry channel walls.

Thomas Buccino's testimonial explanation that the " 'only reason' " the repairs had not been made was his personal belief that they were not necessary in light of his plan to remove the dam.[12] That explanation suggests that the defendants did not misunderstand the requirements of the stipulated judgment. Judge Sheldon stated that "any decision to act on one's personal beliefs instead of complying with a clear court order is a textbook example of wilful conduct. Proof that a person who failed or refused to comply with a court order believed that the terms of that order were unwise, unjust or unfounded establishes a clear motive for his noncompliance and, thus, supports a finding that he acted intentionally or wilfully when he violated those terms." Consequently, unless they had a good defense, the defendants were in civil contempt.

The court concluded that the defendants had presented no valid defense against the civil contempt because their explanations and excuses for their conduct were either legally untenable or factually unsupported on the record. The defendants' claim that it was not possible to perform the repairs is not supported by their explanation that the repairs were not necessary to preserve the integrity and function of the dam. The defendants did not want to make the repairs because they did not want to spend the money to do so. The defendants' refusal to comply with the stipulated judgment was a matter of choice and was not caused by some factor beyond their control.

The court also concluded that the defendants failure to comply with the stipulated judgment could not be grounded in their disagreeing with the terms of the judgment. If they did not agree with permit 95-018, the defendants should have sought to vacate or to modify

---

[12] The court found that both defendants acted and spoke through Thomas Buccino.

it by proper legal process. Until the judgment was modified or vacated, the defendants were obliged to comply. The defendants only moved to open the stipulated judgment twenty months after the 120 day period in which to complete the repairs had expired and never sought to have the motion to open adjudicated in the five years after it had been filed. The court concluded that the motion to open was filed by the defendants to delay further the making of repairs. The motion to open was not filed or prosecuted in a manner to excuse the defendants' prior and continuing failure to satisfy the terms of the stipulated judgment.

The defendants asserted two additional reasons not to have completed the repairs: One, the court's order was unenforceable because a special permit from the corps of engineers was necessary to do the work, and two, through no fault of their own, the defendants had insufficient financial resources. The court found no merit in either defense. The court credited Marsh's testimony that no special permit from the corps of engineers was necessary to perform the work authorized by permit 95-018.[13] As to their defense that they were unable to pay for the repairs, the defendants waived that claim at the beginning of the hearing on the second motion for contempt in exchange for the commissioner's agreement not to enforce the outstanding subpoena duces tecum for the defendants' financial records. The court considered the defendants' claimed defense of inability to pay to have been abandoned.

Having concluded that the defendants were in wilful violation of the stipulated judgment by failing to perform the repairs authorized by permit 95-018 and that

---

[13] Even if the defendants were required to obtain a special permit from the corps of engineers, which they were not under the terms of permit 95-018, they had to comply with federal, state and local laws. Although obtaining the special permit may have delayed the start of repairs, getting approval did not make the repairs impossible to perform.

the wilful violation was not excused by impossibility of performance or inability to perform, the court found the defendants to be in indirect civil contempt of court. The court acknowledged the defendants' argument that by the terms of the stipulated judgment, they had the option to repair or to remove the dam. The judgment, however, required the defendants to submit an application for permission to take whatever remedial action they chose, whether it be to remove or to repair the dam. Application 95-018 was an application to repair the dam and after the commissioner issued permit 95-018, the defendants were obligated to comply with the repairs authorized therein. The court consequently ordered that the defendants perform all of the repairs authorized by permit 95-018 not later than 140 days from the date of its judgment and that if the defendants failed to comply with the order, they pay a coercive fine to the commissioner, for which they shall be jointly and severally liable, in the amount of $500 per day until the repairs are completed. The defendants timely filed an appeal from the judgment of contempt.

III

APPEAL

On appeal, the defendants have raised three specific claims with respect to the judgment of contempt: (1) the court's finding that they could comply with the stipulated judgment is not supported by the evidence, (2) the court was biased against them, and (3) the judgment of contempt is disproportionate to the situation and fails to consider their efforts to repair the dam. None of the defendants' claims is persuasive.

We turn first to the scope of our review. It does not appear from the record that the defendants contested the validity of the court's judgment of civil contempt in the trial court. Because the court was never afforded the opportunity to correct any possible errors in its

ruling, we will review the claims on appeal only insofar as they may constitute plain error. See *Dunham* v. *Dunham*, 217 Conn. 24, 28–29, 584 A.2d 445 (1991).

"The court's authority to impose civil contempt penalties arises not from statutory provisions but from the common law. . . . The penalties which may be imposed, therefore, arise from the inherent power of the court to coerce compliance with its orders. In Connecticut, the court has the authority in civil contempt to impose on the contemnor either incarceration or a fine or both." (Citations omitted.) *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 737–38, 444 A.2d 196 (1982). An appeal from a judgment of civil contempt is technically limited to "questions of jurisdiction such as whether the court had authority to impose the punishment inflicted and whether the act or acts for which the penalty was imposed could constitute a contempt." (Internal quotation marks omitted.) Id., 731. Civil contempt may be improper if, among other things, "the findings on which it was based were ambiguous and irreconcilable . . . ." (Citations omitted.) Id., 732.

"A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in failing to find that the actions or inactions of the [party] were in contempt of a court order. . . . To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt. . . . [T]he credibility of witnesses, the findings of fact and the drawing of inferences are all within the province of the trier of fact. . . . We review the findings to determine whether they could legally and reasonably be found, thereby establishing that the trial court could reasonably have concluded as it did." (Citation omitted; internal quotation marks omitted.) *Rocque* v. *Design Land Developers of Milford, Inc.*, 82 Conn. App. 361, 370, 844 A.2d 882 (2004). "The inability of a party to obey an order of the

court, without fault on his part, is a good defense to the charge of contempt. . . . The contemnor must establish that he cannot comply, or was unable to do so." (Internal quotation marks omitted.) Id., 371.

## A

The defendants first claim that there was insufficient evidence to support the court's finding that they could comply with the terms of the stipulated judgment.[14] We disagree.

The defendants' claim concerns Marsh's inspection of the dam on June 6, 2003, and related testimony. The purpose of the inspection was to determine whether the repairs authorized by permit 95-018 had been completed. The court found that not all of the authorized repairs had been completed. Specifically, the flashboard supports on top of the spillway had not been removed, not all of the trees on the embankment had been removed, the gravel filter blanket had not been installed and the grouting had not been done.[15] The essence of

[14] The defendants do not dispute that some of the repairs authorized by permit 95-018 have not been completed.

[15] The court also found why the unfinished repairs were necessary for the integrity and function of the dam. The flashboard supports on top of the spillway must be removed because they can trap debris and impede the flow of water over the spillway in the event of a large storm. If the spillway became blocked, the rising water in Hall's Pond might flow over the top of the dam and cascade outside of the established streambed, threatening the dam's integrity and potentially causing property damage and personal injury downstream. Removing the remaining trees from the dam's embankment is necessary because their root systems threaten the integrity of the embankment itself. The gravel filter blanket is needed to control ongoing seepage at the toe of the embankment and to prevent internal erosion. Grouting the voids in the spillway channel is necessary to maintain the integrity of the walls themselves. The walls can be weakened by internal erosion of the embankment. The masonry will deteriorate if water is permitted to channel through the walls in an uncontrolled fashion. Weepholes at the end of CV pipes installed in the walls would establish paths through which water accumulating behind and above the walls could be channeled safely outward without causing internal erosion of the embankment and the walls.

the defendants' challenge to the court's finding is that the court implied that the work could have and should have been completed within 120 days of the date permit 95-018 was issued on April 2, 1997. The defendants' claim crumbles, not on the fact that they failed to complete the repairs within 120 days, but on the fact that they failed to complete the repairs more than six years after the permit had been issued.

The defendants challenge the court's finding with respect to the flashboard supports because Marsh testified that the flashboard supports should be removed in dry weather and the year in which he testified, 2004, was not a dry year. For this reason, the defendants argue that they may not have been able to remove the flashboard supports within 120 days of April 2, 1997. The defendants' argument is transparent because the stipulated judgment was not so rigid as to be unreasonable, as it took into consideration factors such as the weather that may have delayed the required repairs.[16] The court found no evidence that the defendants were unable to remove the flashboard supports due to wet weather or that they had informed the commissioner of the same and proposed a new completion date.

The defendants' reason for not installing the gravel filter blanket at the toe of the dam is of lesser merit.

---

[16] The court found that that the agreement "provided that, in the event the defendants, or either of them, became aware that they did not or might not comply on time with any requirement of the judgment, or any document required thereunder, each of them must notify the commissioner immediately and must take all reasonable steps necessary to ensure that noncompliance or delay was avoided or, if unavoidable, was minimized to the greatest extent possible. Furthermore, it provided that, in notifying the commissioner of any past or anticipated inability to perform on time, the defendants must state in writing the reasons for their noncompliance or delay, must propose for the review and written approval of the commissioner new dates by which compliance would be achieved and must thereafter comply with any new dates the commissioner approved in writing." (Citation omitted.)

We take judicial notice that paragraph five of the stipulated judgment contains a weather contingency clause.

The defendants claim that after they removed some of the trees on the embankment, the moisture problem at the toe of the dam was resolved. They further contend that Thomas Buccino is able to assess the condition of the dam on a daily basis. By contrast, it rained on the day Marsh inspected the dam in 2003, and he found the toe of the dam soggy. The defendants, therefore, assert that Marsh's observation did not reflect the true condition of the dam. As the court found, the purpose of removing the trees from the embankment was not to keep the toe of the dam dry, that purpose was to be achieved by installing a gravel filter blanket. See footnote 15. The trees had to be removed because their root systems threaten the integrity of the embankment. Id. The defendants' argument, therefore, does not address the reason the permit required the defendants to install a gravel filter blanket.

As to their failure to grout or to install weepholes, the defendants argue that Marsh is not an expert in stone masonry and could not testify as to the wisdom of grouting a dry laid wall. The defendants overlook the issue before the court. The second motion for contempt required the court to determine whether the defendants wilfully had failed to complete the authorized repairs, not whether the repairs were warranted. Marsh testified as to whether the repairs had been completed. Cross-examination was not the time for the defendants to challenge the appropriateness of the repairs authorized by permit 95-018, as that day had long passed.

We conclude that there was sufficient evidence in the record for the court to determine that the defendants were able to comply with the stipulated judgment.

### B

The defendants' second claim on appeal is that the court was biased against them. They cite as support for their claim examples of the manner in which the

court expressed its findings of fact and the tone of the memorandum of decision. The defendants claim, in short, that they did not get a fair hearing. We disagree.

We begin by noting the inadequacy of the defendants' brief on this issue. The brief cites no law or standard by which an appellate court is to review a claim of judicial bias. Rather, the defendants merely have cited some of the court's conclusions that they believe should have been decided otherwise. They fail to note that credibility falls within the province of the trier of fact and that it is for the trier of fact to weigh the evidence before it. See *Gianetti* v. *Norwalk Hospital*, 266 Conn. 544, 562, 833 A.2d 891 (2003).

Canon 3 (c) (1) (A) of the Code of Judicial Conduct requires that a judge disqualify himself in a proceeding in which his impartiality might reasonably be questioned where, among other things, "the judge has a personal bias or prejudice concerning a party . . . ." For a party to prevail on a claim of a violation of canon 3 (c) (1), the party need not show actual bias, but must prove that "the conduct in question gave rise to a reasonable appearance of impropriety." *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 820, 717 A.2d 1232 (1998).

Appellate courts of this state "use an objective rather than a subjective standard in deciding whether there has been a violation of canon 3 (c) (1). Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not

knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances." (Internal quotation marks omitted.) Id., 820; see also *Papa* v. *New Haven Federation of Teachers*, supra, 186 Conn. 745–46.

On the basis of our review of the record in this fifteen year old case, we conclude that the court did not exhibit bias against the defendants. Much to the contrary, the court displayed patience and fairness and gave the defendants an opportunity to present their side of the story at every turn. We are impressed particularly by the situation created by the conflict of interest between the defendants and their attorney of many years. Judge Sheldon continued the trial on the second motion for contempt and referred the motion to withdraw to another judge for resolution. When substitute counsel appeared for the defendants, Judge Sheldon exercised his discretion in favor of the defendants by opening the evidentiary portion of the trial to take evidence concerning the alleged conflict. When Thomas Buccino's health prevented him from appearing before the court to testify, Judge Sheldon permitted the parties to devise an alternative means of presenting evidence to the court.

As to the court's choice of words to describe its findings and legal conclusions, we find nothing offensive about the language or tone of the memorandum of decision. The English language is a tool for describing many things, including those with subtle differences, and a capable jurist will use language with precision to express clearly his or her findings and conclusions. Just because a court's statement of findings and conclusions is adverse to a party does not make the statement unfairly prejudicial. A salient element of a finding of contempt is that the contemnor's behavior must have been wilful. In this case, the court crafted a thorough and even tempered opinion to describe the stipulated

judgment, the repairs authorized by permit 95-018 and how and why the defendants failed to comply with the terms of the judgment. The court's decision fairly explains why the defendants' behavior was a wilful disregard of a court order.

The defendants take particular umbrage with the court's finding that they chose to submit an application to repair the dam, which the commissioner approved, and that having made that election, their options became more limited. They also find especially irksome the court's conclusion that they have no further right to insist on removing the dam instead of repairing it, as they surrendered the right to remove the dam when they submitted an application to repair it and the commissioner issued permit 95-018 authorizing the repairs. We conclude that there is nothing biased about those findings and conclusions. As the court noted and Thomas Buccino acknowledges, he would prefer to take down the dam rather than to repair it. The fact remains, however, that the defendants entered into an agreement giving them the choice of repairing or removing the dam. They submitted an application to repair it. Although the defendants submitted a motion to open the judgment some five years after it was rendered, they never sought to have the motion adjudicated. Despite their now having second thoughts about the choice that they made, they cannot undo their choice by failing to make the repairs authorized by permit 95-018.

Under all of the circumstances, we cannot conclude that the court was biased against the defendants.

### C

The defendants' third claim is that the court's order of contempt is disproportionate to the situation and fails to consider their efforts to resolve the problem and to repair the dam. We do not agree.

Briefly, as review, the court ordered the defendants to complete the repairs authorized by permit 95-018 within 140 days of its judgment and, if they failed to do so, to pay a coercive fine to the commissioner of $500 per day until the repairs are completed. We also take judicial notice of paragraph eight of the agreement signed by the defendants and the commissioner: "[T]he injunctive provisions of this Judgment are entered under penalty of $500.00 per day per violation. In the event that any of the provisions of the Judgment are violated, the Court may finalize a penalty of no more than this amount and take any other action authorized under its contempt power to coerce compliance with any of the provisions of this Judgment."

"The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience does so at his peril. . . . [A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." (Citation omitted; internal quotation marks omitted.) *Rocque* v. *Design Land Developers of Milford, Inc.*, supra, 82 Conn. App. 366.

In this case, the defendants do not claim that the court was without jurisdiction to consider the second motion for contempt, that the stipulated judgment was unclear and irreconcilable or that, through no fault of their own, they are unable to obey the court's order. See *Papa* v. *New Haven Federation of Teachers*, supra, 186 Conn. 731–32. The defendants do not deny that they have not performed all of the authorized repairs. Permit 95-018 was issued on April 2, 1997, and the repairs it authorized were to be completed within 120 days. It is now 2005, and some of the repairs have not been performed. The court's finding of contempt is not out

of proportion to the situation; it gave the defendants an additional 140 days to complete the repairs, and its coercive fine is consistent with the agreement signed by the defendants on which the stipulated judgment was rendered.

The judgment is affirmed.

In this opinion the other judges concurred.